**STANDARD OIL COMPANY OF CALIFORNIA, a Delaware Corporation, Plaintiff,**

v.

**Joshua C. AGSALUD, Director of Labor and Industrial Relations of the State of Hawaii, and Orlando K. Watanabe, Administrator of the Disability Compensation Division of the Department of Labor and Industrial Relations of the State of Hawaii, Defendants.**

**No. C–76–2740–CBR.**

United States District Court, N. D. California.

Nov. 21, 1977.

Pillsbury, Madison & Sutro, Parker A. Maddux, Woodrow R. Cossey, San Francisco, Cal., for plaintiff.

Ronald Y. Amemiya, Atty. Gen., Edward H. Nakamura, Sp. Deputy Atty. Gen., Linda K. C. Luke, Philip S. Uesato, Mario R. Ramil, Deputy Attys. Gen., Dept. of Labor and Industrial Relations, State of Hawaii, Honolulu, Hawaii, for defendants.

## MEMORANDUM OF OPINION

RENFREW, District Judge.

This case presents two important issues, whether the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001–1381, preempts Hawaii's health insurance laws and, if it does, whether it is constitutional.

### I

ERISA regulates the administration of private employee benefit and pension plans affecting interstate commerce. Pursuant to its authority under the Commerce Clause, U.S.Const. art. I § 8, Congress established standards concerning disclosure to plan participants, reporting to the federal government, vesting of benefits, funding of plans, and conduct of the managers of plans. In addition, Congress created tax incentives to encourage the adoption of private plans and a federal insurance system to guarantee that beneficiaries would receive their benefits. As part of this scheme, Congress preempted "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan * * *." Section 514(a), 29 U.S.C. § 1144(a). Congress, however, exempted from ERISA's regulatory provisions benefit plans maintained to comply with "workmen's compensation laws or unemployment compensation or disability insurance laws." Section 4(b)(3), 29 U.S.C. § 1003(b)(3).

Also in 1974, the Hawaii legislature enacted the Hawaii Prepaid Health Care Act ("Hawaii Act") which required workers in the State to be covered by a comprehensive prepaid health care plan. Haw.Rev.Stat. §§ 393–1—393–51. The Hawaii Act was amended in 1976 to require that the plans cover diagnosis and treatment of alcohol and drug abuse. 1976 Haw.Sess. Laws c. 25, 28 (amending Haw.Rev.Stat. 393–7(c)). Administrative regulations adopted pursuant to the Hawaii Act include certain reporting requirements which differ from those of ERISA. Sections 14, 16, 60–64 of Reg. XLII. Employers who fail to comply with the requirements of the Hawaii Act may be enjoined from carrying on their businesses in any place in the State, and are liable to fines and other remedies. Act 90 of June 8, 1977 (amending § 393–33).

Plaintiff Standard Oil Company of California ("Standard") is a Delaware corporation conducting business in interstate commerce with employees in Hawaii and many other states. Some Standard employees, annuitants, and their dependents including some in Hawaii, have elected to participate in Standard's self-funded health care plan which reimburses 80 per cent or more of covered medical expenses incurred by the participants. Standard's medical plan does not provide certain benefits required by the Hawaii Act, including coverage of alcohol and drug abuse. Standard has failed to comply with certain reporting requirements of the Hawaii Act. The administrative offices of this plan are in the Northern District of California.

When defendants sought to enforce the Hawaii Act against it, Standard filed this suit on December 7, 1976, seeking declaratory and injunctive relief to prevent such enforcement. The Court has jurisdiction under § 502(e)(1) of ERISA, 29 U.S.C. § 1132(e)(1). Venue is proper under

§ 502(e)(2), 29 U.S.C. § 1132(e)(2). The parties entered into a stipulation filed on December 22, 1976, in which defendants agreed not to seek Standard's compliance with the requirements of the Hawaii Act during the pendency of this litigation. Also pursuant to this stipulation, Standard withdrew its motion for a preliminary injunction. On March 3, 1977, the Court orally denied defendants' motion to dismiss and continued their motion to transfer this action to the District of Hawaii. On June 16, 1977, Standard filed a motion for summary judgment, and on June 20, 1977, defendants filed a cross-motion for summary judgment. Defendants also filed a supplemental memorandum in support of their alternative motion to transfer the case to the District of Hawaii because they are exposed to other lawsuits by other corporations seeking analogous relief.

The issues in this case have been, it is fair to say, extensively briefed. The Court also heard oral argument on July 21, 1977. There is no disputed issue of material fact, for the only dispute concerns the preemptive effect of ERISA on the Hawaii Act. The Court concludes that the Hawaii Act is preempted by ERISA and that the preemptive provision of ERISA is constitutional.

## II

Standard's medical plain is an employee welfare benefit plan and an employee benefit plan with the meaning of §§ 3(1) and 3(3) of ERISA, 29 U.S.C. §§ 1002(1) and 1002(3).

Section 3(1) provides in relevant part:

"The terms 'employee welfare benefit plan' and 'welfare plan' mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical,

or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment * * * ."

Section 3(3) provides:

"The term 'employee benefit plan' or 'plan' means an employee welfare benefit plan or an employee pension benefit plan or a plan which is both an employee welfare benefit plan and an employee pension benefit plan."

Standard's plan is maintained for the purpose of providing, through the purchase of insurance, medical, surgical, or hospital benefits, and it is therefore an employee benefit plan within the meaning of § 3.[1] *See Wayne Chemical, Inc. v. Columbus Agency Service Corp.*, 426 F.Supp. 316, 320 (N.D.Ind.1977).

Defendants contend that § 3 applies only to plans adopted voluntarily by the employer without the compulsion of state law. This interpretation requires the Court to read limiting language into § 3 which Congress could easily have placed there itself. Furthermore, if plans required by state law are not employee benefit plans within the meaning of § 3, the exemption in § 4 for plans maintained in order to comply with certain state laws would be completely unnecessary. Congress intended to preserve an area in which states could regulate employee benefit plans, but it implemented its intention in § 4, not in § 3.

## III

The more difficult question is whether the Hawaii Act is a "disability insurance law" within the meaning of § 4(b)(3), 29 U.S.C. § 1003(b)(3). Section 4(b)(3) exempts from subchapter I of ERISA, which contains the reporting, disclosure, vesting, funding, and fiduciary provisions, any employee benefit plan which "is maintained solely for the purpose of complying with applicable workmen's compensation laws or unemployment compensation of disability insurance laws."

1. For the sake of brevity and convenience, the shorter term "employee benefit plan" or "plan" will be used to refer to plans like Standard's.

It is helpful first to identify what the preemption issue is and what it is not. The Court is not required in this case to infer preemption from the structure of a federal act without a preemption clause. *Cf. DeCanas v. Bica,* 424 U.S. 351, 358, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976). Nor is this a case involving the feasibility of dual regulation of employee benefit plans by both state and federal governments. Standard's medical plan is covered either by federal law or by state law but not by both. A case like *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 237, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947), which involves federal regulation of some aspects of a particular field and consistent state regulation of other aspects, is distinguishable because Congress has by unambiguous language eliminated that option of interpretation. *See* Part IV, *infra.* Nor need the Court determine whether state health insurance laws in general or the Hawaii Act in particular "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in ERISA, *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941), and is therefore implicitly preempted even though the preemption clause drafted by Congress did not cover it. *Cf. Jones v. Rath Packing Co.,* 430 U.S. 519, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977).

In ERISA, Congress has said that all state laws relating to private employee benefit plans are preempted except workmen's compensation, unemployment compensation, and disability insurance laws. The parties agree that a health insurance law is not a workmen's or unemployment compensation law within the meaning of § 4(b)(3), that workmen's compensation laws only replace lost income and defray medical expenses associated with work-related illness and jury, and that unemployment compensation laws replace income lost by involuntary loss of employment for nonmedical reasons. They also agree that disability insurance laws replace wages lost because of nonoccupational illness and injury. Their dispute centers on whether disability insurance laws, as understood by Congress in § 4(b)(3), provide a second type of benefit

related to nonoccupational illness and injury in addition to wage replacement—payment of medical expenses.

Although health and disability insurance laws can also be distinguished by the types of benefits they provide, see pp. 698–702, *infra,* a more fundamental difference involves the type of contingency against which they insure. As used in all disability insurance laws cited by defendants and of which the Court is aware, disability is a specialized term referring to a mental or physical condition which prevents an individual from pursuing his regular occupation. *See e. g.,* 42 U.S.C. § 423(d) (Social Security Act); 45 U.S.C. § 351(k) (Railroad Unemployment Insurance Act); Haw.Rev. Stat. § 392–3(5) (Hawaii Temporary Disability Insurance Law); Cal.Unemp.Ins. Code § 2626 (West); N.Y.Work.Comp.Law § 201(9) (McKinney); N.J.Stat.Ann. § 43:21–29 (West) (Temporary Disability Benefits Law); R.I.Gen.Laws § 28–39–2(14) (R.I. Temporary Disability Insurance Act); P.R.Laws Ann. Tit. 11 § 202(g) (Disability Benefits Act); *see also* G. Osborn, Compulsory Temporary Disability Insurance in the United States 3–4 (1953). A disability insurance law requires insurance against disability, against *disabling* nonoccupational illness and injury. In contrast, a health insurance law like the Hawaii Act requires insurance against *all* nonoccupational illness and injury, whether disabling or not. Nondisabling illnesses and injuries constitute at least a substantial portion of the complaints treated through prepaid health care plans. One of the major arguments in favor of such plans is that they facilitate the practice of preventive medicine so that illnesses and injuries are dealt with before or in their incipiency while they are not disabling. Because the Hawaii Act requires insurance against conditions which are not disabilities in any accepted sense of the term, it cannot be considered a disability insurance law within the meaning § 4(b)(3).

A second and more technical reason why the Hawaii Act is not a disability insurance law is that the benefits available under disability insurance laws are limited basical-

ly to replacement of wages whereas the benefits required by the Hawaii Act in employee benefit plans cover medical and hospital expenses.

The disability insurance law with which Congress is perhaps most familiar is the Old-Age, Survivors, and Disability Insurance provisions of the Social Security Act, 42 U.S.C. §§ 401 et seq. Section 423(a)(2) of Title 42 provides for the payment of a "disability insurance benefit" to a covered individual "in an amount equal to his primary insurance amount * * * determined under section 415 of this title." "In computing the primary insurance benefits payable under the [Social Security] Act, the wage earner's 'average monthly wage' as defined in 42 U.S.C. § 415(b) is the crucial factor." *Lerner v. Richardson*, 393 F.Supp. 1387, 1388 (E.D.Pa.1975). Thus, at least in this disability insurance law, disability benefits are limited to benefits calculated on the basis of past income, not on the basis of medical expense incurred as a result of the disability. Indeed, Congress distinguished "hospital insurance benefits" in § 426 and "medical insurance benefits" in § 1395j for the disabled from "disability insurance benefits" for the disabled. This congressional usage supports the Court's conclusion that disability insurance benefits are not the same as medical and health insurance benefits like those required by the Hawaii Act.

The federal Railroad Unemployment Insurance Act, 45 U.S.C. §§ 351–367, is another federal disability insurance law which provides benefits limited to wage replacement. Under that Act, railroad employees unable to work because of physical or psychological illness or injury receive daily benefits calculated on the basis of their income. The only type of disability insurance benefit contemplated by this Act is wage replacement.

The legislative history of the Welfare and Pension Plans Disclosure Act of 1958, Pub. L.No. 85–836, 72 Stat. 997 ("WPPDA") (repealed by § 111(a)(1) of ERISA, 29 U.S.C. § 1031(a)(1)), also provides some guidance to legislative intent in ERISA. The language of § 4(b)(3) of ERISA evolved from language first used by Congress in § 4(b)(2) of WPPDA, 29 U.S.C.A § 303(b)(2). Section 4(b)(2) provides that WPPDA "shall not apply to an employee welfare or pension benefit plan if— * * * such plan was established and is maintained solely for the purpose of complying with applicable workmen's compensation laws or unemployment compensation disability insurance laws." That phrase was used verbatim in § 101(b)(2) of H.R. 2, 93d Cong., 1st Sess. (1973), the bill that eventually became ERISA. Since WPPDA and ERISA were enacted sixteen years apart and since the language of the exemption clause in the two Acts is slightly different,[2] the meaning of disability insurance laws in the 1958 Act is not determinative of the interpretation of the 1974 Act, as defendants contend. Nevertheless, Congress' intent in the earlier Act is relevant to its intent in the later Act.

In recommending the enactment of S. 2888, the bill which eventually became WPPDA, the Senate Committee on Labor and Public Welfare stated that "the temporary disability insurance laws of a few of the States * * * are designed to replace, in part, the loss of the wages of the family breadwinner during periods of temporary disability." S.Rep. No. 1440, 85th Cong., 2d Sess. 6, 1958 U.S.Code Cong. & Adm.News 4142. That definition excludes state laws like the Hawaii Act which require health care benefits.

As the citation to the table following this quotation shows, the Senate Committee relied in 1958 upon evidence which it compiled in 1956 during its investigation of welfare and pension plans. The final report of that investigation discussed disability insurance:

'Temporary disability insurance, as distinguished from workmen's compensation insurance, is not provided by Federal statute except in a few instances, such as railroad retirement, maritime and certain

---

2. During the course of redrafting H.R. 2, the phrase "was established and" before "is maintained" was deleted, and a comma and "and" were inserted between "unemployment compensation" and "disability insurance."

phases of State unemployment insurance laws. Four States do require such insurance: Rhode Island has an exclusively publicly operated plan; California, New Jersey, and New York permit coverage through insurance companies, a State fund, or self-insurance." S.Rep. No. 1734, 84th Cong., 2d Sess. 16 (1956).

None of the examples of disability insurance laws mentioned in this Report are comparable to the Hawaii Act.

The first example of a disability insurance law, the Federal Railroad Unemployment Insurance Act, as discussed at page 699, *supra,* provides insurance only against disabling illnesses and injuries and benefits limited to wage replacement.

The second example of disability insurance laws given in S.Rep. No. 1734 involves maritime law. The traditional maritime remedy of cure, usually linked with maintenance, provides for compensation of all medical expenses incurred as a result of illness or injury while in the service of a ship. The illness or injury need not be causally related to shipboard duties. *Calmar S.S. Corp. v. Taylor,* 303 U.S. 525, 58 S.Ct. 651, 82 L.Ed. 993 (1938); G. Gilmore & C. Black, "The" Law of Admiralty, 287–288 (2d ed. 1975). The shipowner is also obligated to provide cure if the injury is received on shore leave. *Aguilar v. Standard Oil Co.,* 318 U.S. 724, 63 S.Ct. 930, 87 L.Ed. 1107 (1943); Gilmore & Black, *supra,* at 289–290.

It is doubtful that Congress intended by this reference to suggest that disability insurance for all workers generally includes coverage of medical care for nonoccupational illness and injury. Maritime law is *sui generis.* The relationship between marine employers and employees has long been recognized as fundamentally different from the relationship between terrestrial employers and employees:

"Unlike men employed in service on land, the seaman, when he finishes his day's work, is neither relieved of obligations to his employer nor wholly free to dispose of his leisure as he sees fit. Of necessity, during the voyage he must eat, drink,

lodge and divert himself within the confines of the ship. In short, during the period of his tenure the vessel is not merely his place of employment; it is the framework of his existence. For that reason, among others, his employer's responsibility for maintenance and cure extends beyond injuries sustained because of, or while engaged in, activities required by his employment." *Aguilar v. Standard Oil Co., supra,* 318 U.S. at 731–732, 63 S.Ct. at 934.

This unique relationship also explains why the employer's liability extends to illnesses and injuries incurred on shore leave:

"To relieve the shipowner of his obligation in the case of injuries incurred on shore leave would cast upon the seaman hazards encountered only by reason of the voyage. The assumption is hardly sound that the normal uses and purposes of shore leave are 'exclusively personal' and have no relation to the vessel's business. Men cannot live for long cooped up aboard ship, without substantial impairment of their efficiency, if not also serious danger to discipline. Relaxation beyond the confines of the ship is necessary if the work is to go on, more so that it may move smoothly. No master would take a crew to sea if he could not grant shore leave, and no crew would be taken if it could never obtain it. Even more for the seaman than for the landsman, therefore, 'the superfluous is the necessary . . . to make life livable' and to get work done." *Aguilar v. Standard Oil Co., supra,* 318 U.S. at 733–734, 63 S.Ct. at 935 (footnote omitted).

This conclusion is supported by the reluctance of courts to extend the obligation of maintenance and cure to "commuter seamen" whose employment is analogous to land-based employment. Gilmore & Black, *supra,* at 292. Finally, the shipowner's obligation to provide cure is fundamentally different from Hawaii employers' duty to provide prepaid health care coverage because seamen are entitled to free medical care from United States Public Health Service Hospitals, 42 U.S.C. § 249(a), and because

seamen's recovery for cure is limited to medical care "not at the disposal of the seaman through recourse to that service." *Calmar S.S. Corp. v. Taylor, supra,* 303 U.S. at 531, 58 S.Ct. at 654; *Benton v. United Towing Co.,* 120 F.Supp. 638, 641 (N.D.Cal. 1954), *aff'd on other grounds,* 224 F.2d 558 (9 Cir. 1955) (*per curiam* ); *Roberson v. S/S American Builder,* 265 F.Supp. 794, 796–797 (E.D.Va.1967). For all these reasons, maritime law includes a special kind of disability insurance law not closely analogous to the others mentioned in the Senate Report in 1956 or to the Hawaii Act.[3]

Senate Report No. 1734 also identified four states, New Jersey, Rhode Island, New York, and California, which required disability insurance. In all four of those states, the amount of the primary benefit is calculated on the basis of the worker's wages before he suffered the disability. N.J.Stat.Ann. § 43:21–40 (West); R.I.Gen. Laws § 28–41–4 and 28–41–5; N.Y.Work. Comp.Law § 204 (McKinney); Cal.Unemp. Ins.Code § 2655 (West). In two of those states the stated purpose of the disability insurance is to "replace wage loss." N.J. Stat.Ann. § 43:21–26 (West); Cal.Unemp. Ins.Code § 2601 (West).

New York and California provide variations on this theme of wage replacement. By administrative regulation, New York permits employers to implement plans with "other benefits directly related to disability" that are "at least as favorable" to the worker as the statutory benefits, including hospital and medical benefits if their value is comparable to that of the cash benefits calculated on the basis of wages. Sections 355.8 and 375.1, Rules of N.Y. Workmen's Compensation Board, reprinted in Appendix to N.Y.Work.Comp.Law (1977 Supp.McKinney). In other words, that benefit can be paid either to the disabled worker or to the organization which provides health care to the disabled worker, but in either case, the amount of the payment depends on wages. This controversial[4] administrative interpretation does not signal a change from the basic policy of the New York disability insurance law to replace a portion of wages lost because of disabling illness or injury.

California provides nominal medical care benefits to hospitalized disabled people under the Jesse Mayo Disability Insurance Hospital Benefits Law. Cal.Unemp.Ins. Code §§ 2800–2804 (West). When first enacted, the law provided eight dollars per day for up to twelve days, 1949 Cal.Stats. ch. 951, § 2, and the maximum has since been increased to twelve dollars per day for up to twenty days. Cal.Unemp.Ins.Code § 2801 (West). The major benefit available to disabled workers is still the weekly cash payment calculated on the basis of wages during a defined period.[5] There is no indication that Congress was aware of the relatively minor provisions concerning hospital benefits in the California disability insurance law.

In sum, the federal and state disability insurance laws cited in Senate Report No. 1734 were primarily designed to replace income lost during periods of disability.

---

3. Another predicate for the comprehensive protection of sailors in maritime law is that the law has always taken a very dubious view of their character. Defendants do not analogize the Hawaii Act to maintenance and cure on the ground that citizens of Hawaii, like sailors, are characterized by "habits of gross indulgence, carelessness, and improvidence." *Harden v. Gordon,* 11 Fed.Cas. 480, 483, Case No. 6,047, (C.C.D.Me.1823) (Story, J.). Nor do defendants argue that the state has compelling interest in requiring employee benefit plans to cover alcohol abuse because of the "classic predisposition" of Hawaiians to intemperate use of stimulants. *Cf. Aguilar v. Standard Oil Co.,* 318 U.S. 724, 731, 63 S.Ct. 930, 87 L.Ed. 1107 (1943).

4. G. Osborn, *Compulsory Temporary Disability Insurance in the United States* 119–120 (1953).

5. According to the treatise most heavily relied on by defendants, the decision in 1949 to provide hospital benefits in addition to wage-replacement benefits was not part of a major rethinking of the purpose and function of disability insurance. The hospital benefits were provided "as an alternative to an increase in cash benefits * * * in an effort to appease labor after the defeat of [a] cash-benefit bill." G. Osborn, *supra,* at 119 n.47.

Even more significant is the fact that the only states which now have disability insurance laws are the four states mentioned in this Senate Report and Hawaii, which, in addition to its health insurance law, has a disability insurance law which provides benefits calculated on the basis of wages to workers who are unable to perform work due to illness or injury, Haw.Rev.Stat. ch. 392. Unempl.Ins.Rep. (CCH) ¶ 2510.[6] When Congress drafted the exemption clause of ERISA, no disability insurance law provided the type of benefits required by the Hawaii Act. There is no reason to think that Congress intended to include Hawaii's unique law in its definition of disability insurance laws.[7]

Defining disability insurance laws in terms of the types of benefits they provide may seem rather technical, but ERISA was drafted by specialists in the field of pension law familiar with the intricacies and nuances of that subject. In such a case, "it is incumbent on [courts] to give the word its technical meaning * * * if the word be deemed to have a peculiar connotation for those intimate with" the subject matter of the statute. *NLRB v. Coca-Cola Bottling Co.*, 350 U.S. 264, 269, 76 S.Ct. 383, 386, 100 L.Ed. 285 (1955) (interpretation of term "officer" of labor organization). Some state disability insurance laws, like California's, may require a few additional supplemental benefits, but no state disability insurance law provides the broad range of health care benefits that the Hawaii Act requires. Indeed, defendants note with pride that the Hawaii Act is the first state health insurance law in the nation. Since the Hawaii Act requires insurance against more than disabilities and since it requires significant-

ly different types of benefits than disability insurance laws, it is not a disability insurance law within the meaning of § 4(b)(3).

This analysis of the term "disability insurance laws" demonstrates that neither its plain nor its technical meaning comprehends health insurance laws. Under the so-called plain meaning rule of statutory construction, "[w]here the language is plain and admits of no more than one meaning the duty of interpretation does not arise and the rules which are to aid doubtful meanings need no discussion." *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917). That rule was rejected by the Supreme Court in *Train v. Colorado Public Interest Research Group*, 426 U.S. 1, 23–24, 96 S.Ct. 1938, 48 L.Ed.2d 434 (1976) (*"CPIRG"*), where it concluded "after a review of the legislative materials that reliance on the 'plain meaning' of the words [of the statute] contributes little to our understanding of" congressional intent. However, reliance on the plain meaning of judicial language can sometimes be as treacherous as reliance on the plain meaning of legislative language, and the holding in *CPIRG* did not make a federal rule of law of "the quip that only when legislative history is doubtful do you go to the statute." *See* Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum.L. Rev. 527, 543 (1947).

The Supreme Court in *CPIRG* held only that courts can and should consider legislative history even if the language of the statute is clear. *CPIRG, supra*, 426 U.S. at 9–10, 96 S.Ct. 1938, 48 L.Ed.2d 434, citing *United States v. American Trucking Ass'ns*, 310 U.S. 534, 543–544, 60 S.Ct. 1059, 84

---

**6.** Puerto Rico also has a disability insurance law which operates according to the same principles. P.R.Laws Ann. Tit. II §§ 201–212. This law also provides for death and dismemberment benefits of fixed amounts. § 203(f).

**7.** Defendants rely heavily on a book by Grant M. Osborn, *supra*, to establish that disability insurance laws provide medical benefits. However, Osborn's position is not that such laws *do* provide those benefits but that they *should* provide them. *Id.*, at 119.

Plaintiffs contend such books and articles are irrelevant in the absence of evidence that Congress was specifically aware of them. While the relevance of such items may be limited, one guide to interpretation of congressional language is how the terms, especially more or less technical terms, were commonly used, and treatises in the field are one indication of this usage. *Train v. Colorado Public Interest Research Group*, 426 U.S. 1, 9–10, 96 S.Ct. 1938, 1942, 48 L.Ed.2d 434 (1976), establishes that no type of aid to statutory construction is categorically excluded from a court's consideration.

L.Ed. 1345 (1940) (no rule of law forbidding resort to any aid in interpretation), and Murphy, Old Maxims Never Die: The "Plain-Meaning Rule" and Statutory Interpretation in the "Modern" Federal Courts, 75 Colum.L.Rev. 1299 (1975). The issue in *CPIRG* was whether the Environmental Protection Agency had authority under the Federal Water Pollution Control Act to regulate the discharge of nuclear materials subject to regulation by the Atomic Energy Commission. The Court relied on the unambiguous and uncontradicted legislative history dealing with that precise issue to decide that the unelaborated statutory term "radioactive materials" did not include radioactive materials regulated by the Atomic Energy Commission.

The rule of statutory construction established in *CPIRG* is that unambiguous evidence in the structure and history of the legislation can rebut a contrary presumption created by unambiguous language of the legislation. Courts cannot amend statutes in the guise of interpreting them, and they must presume that Congress meant what it said. But the presumption, though heavy, is rebuttable. It is not yet the prevailing federal rule that "[t]here is no surer way to misread any document than to read it literally." *Guiseppi v. Walling*, 144 F.2d 608, 624 (2 Cir. 1944) (L. Hand, J., concurring), *aff'd sub nom. Gemsco Inc. v. Walling*, 324 U.S. 244, 65 S.Ct. 605, 89 L.Ed. 921 (1945).[8] Only "unmistakable support in the history and structure of the legislation," *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975) (Powell, J., concurring), can justify a rejection of otherwise unambiguous language. Such "unmistakable support" for defendants' construction is absent here.

The purpose of the exemption clause in § 4(b)(3) was clearly not to accommodate all types of social insurance laws broadly analogous to workmen's compensation, unemployment compensation, or disability insurance laws that require the adoption of employee benefit plans. The language of the exemption clause simply does not permit this expansive interpretation.

Congress' statement of purposes concerning the plan termination insurance requirements does not compel a broad reading of the exemption clause. One congressional purpose in its plan for termination insurance was "to encourage the continuation and maintenance of *voluntary* private pension plans for the benefit of their participants * * *." Section 4002(a)(1), 29 U.S.C. § 1302(a)(1) (emphasis added). Under § 4021(b)(11), 29 U.S.C. § 1321(b)(11), employee benefit plans "maintained solely for the purpose of complying with applicable workmen's compensation laws or unemployment compensation or disability insurance laws" are exempt from the requirement of plan termination insurance. There is no reason to think that Congress meant different things when it used the same exemption language in §§ 4(b)(3) and 4021(b)(11), and § 4002(a)(1) gives some basis to conclude that Congress meant to exempt all nonvoluntary plans from ERISA. Nevertheless, when it came to implementing its stated purposes, Congress used narrow language in § 4021(b)(11) inconsistent with the broader language of § 4002(a)(1), and the Court must assume that the language in the operative section, § 4021(b)(11), more accurately expresses Congress' intent.[9]

---

**8.** Belying the plain meaning of that statement, Judge Hand went on to admit that the words of a statute, though "by no means final," "are by far the most decisive evidence" of how Congress would have dealt with unforeseen situations. *Id.*, at 624.

**9.** Defendants also contend that the frequent references in the legislative history to "private" benefit plans reflect a congressional decision to limit ERISA to voluntary plans. See Defendants' Memorandum in Reply to Plaintiff's Op-

position to Cross Motion for Summary Judgment, at 21–23. These references to "private" plans were intended to refer to plans which are maintained neither by the government nor for *government employees*. For example, House Report No. 93–533, 93d Cong., 2d Sess., 1974 U.S.Code Cong. & Admin.News, 4640, discussed the growth of private plans and compared governmental plans like the Railroad Retirement Act and the Social Security Act with private plans. Both those Acts established funds administered by the government

Had Congress intended its enumeration of state laws in the exemption clause to be illustrative rather than exhaustive, it could have expressed that intention in plain language. Congress could have included a more open-ended exception broad enough to cover health insurance laws. New Jersey, for example, does not provide benefits under its disability insurance law if the potential recipient is entitled to benefits "under any unemployment compensation or similar law, or under any disability or cash sickness benefit or similar law, of this State or of any other State or of the Federal Government." N.J.Stat.Ann. § 43:21–20. Even more simply and directly, Congress could have said—and legislation now pending in Congress would amend § 4(b)(3) to say [10] —that plans maintain solely to comply with state disability *and* health insurance laws are exempt from ERISA. Certainly Congress was familiar with the concept of health, as opposed to disability insurance. Congress' failure to include such language must be interpreted as a decision not to exempt employee benefit plans maintained to comply with types of state social insurance laws not enumerated in § 4(b)(3).

Congress' intent to limit this exemption is also manifested directly in the language of § 4(b)(3). That section exempts employee benefit plans which are "maintained *solely* for the purpose of complying with" the enumerated laws. (Emphasis added.) Standard contends that because its health insurance plan, which is voluntarily maintained for employees outside Hawaii as well as for its Hawaiian employees, provides most of the benefits required by the Hawaii Act, it is not maintained "solely" to comply with the Hawaii Act and is therefore covered only by ERISA. If that is the test to determine whether a plan is covered only by ERISA or only by a state social insurance law, some interstate businesses would have to comply with the Hawaii Act and others would not, depending on whether the

for the payment of benefits. Private plans contrast with public plans, as in the case of the exemption for government plans for employees in the public sector, § 3(32), 29 U.S.C. § 1002(32).

particular business would voluntarily have adopted a generally equivalent plan. Congress did not intend the Department of Labor or the courts to engage in a company-by-company inquiry to determine whether each employee benefit plan would have had the same general contours even if it were not required by law. Congress intended states to apply their disability insurance laws against all interstate companies or against none.

The test to determine whether ERISA applies to an employee benefit plan is whether employee benefit plans providing that general type of benefit are usually maintained solely to comply with state social insurance laws or generally maintained for other or additional reasons. Employee benefit plans meeting the carefully structured and comprehensive requirements of state workmen's compensation, unemployment compensation, and disability insurance laws clearly fall within the former category. In contrast, the Hawaii Act regulates a type of employee benefit plan generally and historically maintained for other reasons, and it requires a combination of features duplicated in many voluntary plans. By exempting only those plans "maintained solely" to comply with state social insurance laws, Congress intended to make ERISA reach all types of plans not generally required by state law. In other words, Congress intended to permit only traditional forms of state social insurance laws to continue to operate, and the Hawaii Act, the first state health insurance law in the country, is hardly a traditional state social insurance law.

Congress' intent to confine the exemption clause within strict limits is also demonstrated by the statements of conference committees and legislative leaders and sponsors discussed by this Court in *Hewlett-Packard Co. v. Barnes*, 425 F.Supp. 1294, 1298–1300 (N.D.Cal.1977) (on appeal). De-

**10.** S. 1383, 95th Cong., 1st Sess. (1977).

fendants' expansive interpretation of § 4(b)(3) is inconsistent with the statutory history as well as the legislative language.

Finally, the United States Department of Labor has interpreted ERISA to apply to Standard's medical plan and to preempt the Hawaii Act. Opinion Letter 75–22, [1976] Pens.Plan Guide (CCH) ¶ 25,136. Courts must respect "the interpretation given the statute by the officers or agency charged with its administration," particularly when the interpretation is made contemporaneously with the enactment of the statute. *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *Norwegian Nitrogen Products Co. v. United States*, 288 U.S. 294, 315, 53 S.Ct. 350, 77 L.Ed. 796 (1933). Instead of delegating this function to the Secretary of Labor, *cf.* § 505, 29 U.S.C. § 1135, Congress itself prescribed in § 4(b)(3) the standards for determining whether a state social insurance law is exempt from ERISA, so the Department of Labor interpretation is entitled to "important but not controlling significance." *See Batterton v. Francis*, 432 U.S. 416, 424, 97 S.Ct. 2399, 53 L.Ed.2d 448 (1977). The interpretation is consistent with the language and purpose of the statute.

The Court recognizes that the legislative history discloses no explicit congressional decision that state health insurance laws should be preempted. Neither the parties nor the Court in its independent research found any specific discussion in Congress about the pros and cons of that course.

Congress had three options concerning the regulation of benefits in employee benefit plans: federal regulation, state regulation, and private regulation. Either the federal government, the state governments, or the parties themselves could decide what benefits a plan should provide. It is uncertain whether Congress considered federal regulation as a serious option. There is some indication in the legislative history that Congress thought voluntary regulation was affirmatively desirable. In their reports, for example, both the House Committee on Ways and Means and the Senate Committee on Finance stated that a "fun-

damental aspect of present law, which the committee bill continues, is reliance on voluntary action by employers * * * for the establishment of retirement plans." H.R.Rep.No.93–807, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Admin. News, p. 4677; S.Rep.No.93–383, 93d Cong., 2d Sess., *supra*, at 4898–4899. The Senate Committee on Labor and Public Welfare noted "the freedom of decision making vital to pension plans" and "the interests of employers and labor organizations in maintaining flexibility in the design and operation of their pension programs." S.Rep.No.93–127, 93d Cong., 2d Sess., *supra*, at 4849–4850. The preponderance of the legislative evidence, however, indicates that Congress simply accepted voluntary regulation as a premise which limited its ability to regulate the administration of such plans. As the House Committee on Education and Labor reported, "the committee has been *constrained* to recognize the voluntary nature of private retirement plans." H.R.Rep.No. 93–533, 93d Cong., 2d Sess. *supra*, at 4639 (emphasis added). Because "under our voluntary pension system, the cost of financing pension plans is an important factor in determining whether any particular retirement plan will be adopted and in determining the benefit levels if a plan is adopted," "in the case of those requirements which add to the cost of financing retirement plans, the committee has sought to adopt provisions which strike a balance between providing meaningful reform and keeping costs within reasonable limits." S.Rep.No. 93–383, 93d Cong., 2d Sess., *supra*, at 4904. Whether or not Congress rejected federal regulation of benefits on its merits, it apparently did not reject the second option of state regulation on its merits, although it was generally concerned about the cost to employees benefit plans of complying with government regulation.

The Court is reluctant to impute to Congress an intent to preempt state laws which involve such important legitimate state interest without any specific evidence of this intent in the legislative history. Where Congress acts in a field traditionally occupied by the states, the Court must begin

" 'with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' " *Jones v. Rath Packing Co., supra,* 430 U.S. at 525, 97 S.Ct. at 1309, *quoting Rice v. Santa Fe Elevator Corp., supra,* 331 U.S. at 230, 67 S.Ct. 1146. That reluctance is increased because Congress itself recognized the need to accommodate state interests in this area. Congress intended in ERISA to standardize the law governing employee benefit plans. It nevertheless permitted the states to continue to enforce their workmen's compensation, employment compensation, and disability insurance laws although those laws vary substantially from state to state. Mere incantation of the congressional goal of uniformity in regulation cannot resolve this question of statutory construction.

But just as the legislative history contains no unambiguous evidence that Congress intended to preempt state health insurance laws, it contains no unambiguous evidence that Congress did not intend to preempt them. The legislative history is for the most part silent or at best conflicting on this issue. As the discussion in Part V, A, demonstrates, the structure and purposes of ERISA do not necessarily require the exemption of employee benefit plans maintained to comply with state health insurance laws. Given the state of the legislative history, the only sure guide to congressional intent is the language Congress used, and that language clearly means that ERISA preempts state health insurance laws. An ambiguous legislative history, even combined with presumptions against implicit revisions of " 'the federal-state balance,' " *Jones v. Rath Packing Co., supra,* 430 U.S. at 525, 97 S.Ct. 1305, *quoting United States v. Bass,* 404 U.S. 336, 349, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971), and against interpretations which require courts to decide constitutional questions, is insufficient to overcome the plain meaning of the statute.

"Here as so often there is a choice between uncertainties" in statutory construc-

tion, *Burnet v. Guggenheim,* 288 U.S. 280, 288, 53 S.Ct. 369, 372, 77 L.Ed. 748 (1933), but it is more likely that Congress intended in ERISA to preempt state health insurance laws than that it did not. For all the foregoing reasons, the Court concludes that employee benefit plans maintained in whole or in part to comply with state health insurance laws are not exempt from the requirements of ERISA.

## IV

Defendants' final statutory argument is that the Hawaii Act does not relate to Standard's employee benefit plan within the meaning of § 514 of ERISA, 29 U.S.C. § 1144.

Section 514(a) provides in relevant part:

"Except as provided in subsection (b) of this section, the provisions of this subchapter [concerning reporting, disclosure, vesting, funding and fiduciary duties] and subchapter III of this chapter [concerning plan termination insurance] shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title."

Section 514(b) excludes specified types of state laws, primarily banking, insurance, and criminal laws, from this broad preemption clause.

The construction of § 514(a) proposed by defendants would result in partial preemption. The requirements of ERISA concerning the administration of employee benefit plans would apply to plans mandated by the Hawaii Act—only § 4(b)(3) exempts benefit plans from the application of ERISA. Insofar as the Hawaii Act does not regulate matters covered by ERISA (basically reporting, disclosure, funding, vesting, and fiduciary duties), it would not, under this interpretation, be superseded because it does not relate to employee benefit plans in any of the ways that ERISA relates to employee benefit plans.[11] ERISA and the

---

11. Any argument that a state law concerning the same subject matter as ERISA does not

"relate to" employee benefit plans within the meaning of § 514(a) is unsupportable. As the

Hawaii Act would be complementary, each occupying part of a field not occupied by the other. Under this interpretation, Hawaiian workers would obtain the protection of both the Hawaii Act, which regulates benefits but not administration, and ERISA, which regulates administration but not benefits. However wise Congress might have been to take this approach to preemption of state laws regulating employee benefit plans, Congress clearly rejected it.

The starting point is necessarily the language of the statute. In any normal meaning, the Hawaii Act relates to employee benefit plans. Laws relating to benefits of employee benefit plans relate to those plans as much as laws relating to their administration. There is simply no basis in the language of § 514(a) for distinguishing between types of state laws all of which "relate to" employee benefit plans. When Congress says "any and all State laws," courts cannot conclude that Congress really meant to say "some but not all State laws."

The language of § 514(c)(2) buttresses this interpretation. In § 514(c)(2) Congress defined the term "State" to include "a State, any political subdivisions thereof, or any agency or instrumentality of either, which purports to regulate, directly or indirectly, the terms and conditions of employee benefit plans covered by this subchapter." Obviously Congress intended that § 514 have broad preemptive effect. To hold that a state health insurance law does not regulate directly or indirectly the terms and conditions of employee benefit plans would distort the meaning of those words beyond recognition.

Any lingering suspicion that § 514(a) might not mean what it says vanishes when the legislative history is examined. Con-

gress chose the term "relate to" only after rejecting several narrower alternative phrasings. The evolution of § 514(a) is traced in *Hewlett-Packard Co. v. Barnes, supra*, 425 F.Supp. at 1298 & nn. 13–14. This evolution indicates a legislative intent to expand the scope of the preemptive clause and forecloses any interpretation which would narrow its scope beyond its plain language. That interpretation, if it needs reinforcement, is supported by statements of the conference committee and of the legislative sponsors of ERISA which are set forth in *Hewlett-Packard Co. v. Barnes, supra*, 425 F.Supp. at 1298–1300.

Congress also explicitly preempted state laws which, if not at the time ERISA was enacted but thereafter, related to employee benefit plans. Whether Congress should have passed a law which preempted state laws which related to employee benefit plans in novel and perhaps unforeseen ways is a question for Congress and not for the Court.[12]

Under § 514(a), ERISA supersedes the Hawaii Act.

### V

Defendants contend that this construction of ERISA makes it unconstitutional both under the Due Process Clause of the Fifth Amendment and under the Tenth Amendment. Defendants do not contend that Congress lacks the authority under the Commerce Clause generally to regulate in the area of employee benefit plans involving interstate commerce or that federal regulation can never preempt state regulation occupying the same field.

The Court concludes that ERISA as construed is constitutional.

---

evolution of the language of the preemption clause (*see Hewlett-Packard Co. v. Barnes, supra,* 425 F.Supp. at 1298 & nn. 13–14) unequivocally shows, that section was intended at the very least to preempt state laws regulating disclosure, reporting, vesting, funding, and fiduciary duties of plan administrators.

**12.** In view of its interpretation of § 514(a), the Court need not decide whether state health

insurance laws are implicitly preempted because they stand "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1940), even though they are not explicitly preempted. *See Jones v. Rath Packing Co., supra*, 430 U.S. 519, 97 S.Ct. 1305, 51 L.Ed.2d 604.

### A

Defendants argue that there is no valid basis for distinguishing state workmen's compensation, unemployment compensation, and disability insurance laws from state health insurance laws and that the exemption in § 4(b)(3) for the former and not the latter deprives defendants of due process of law.

The Due Process Clause of the Fifth Amendment does require that Congress employ only those classifications that are rationally related to the achievement of legitimate federal goals. *Richardson v. Belcher,* 404 U.S. 78, 84, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971); *Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1953). The Supreme Court's definition of the standard of review under the Equal Protection Clause of the Fourteenth Amendment applies equally to this litigation under the Fifth Amendment:

"In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.' *Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61, 78, [31 S.Ct. 337, 1340, 55 L.Ed. 369]. 'The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific.' *Metropolis Theatre Co. v. City of Chicago,* 228 U.S. 61, 69–70, [33 S.Ct. 441, 443, 57 L.Ed. 730]. 'A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it.' *McGowan v. Maryland,* 366 U.S. 420, 426, [81 S.Ct. 1101, 1105, 6 L.Ed. 2d 393]." *Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970).

The legislative purposes in the preemption provisions are clear and legitimate. Congress wanted employee benefit plans subject to uniform federal regulation so that administrators of plans would not face the uncertainty and expense of compliance with diverse and often conflicting state regulations which often provided less protection for beneficiaries than Congress considered necessary. *See Hewlett-Packard Co. v. Barnes, supra,* 425 F.Supp. at 1298–1300. The only question is whether preempting health insurance laws but not certain other types of state social insurance laws rationally furthers that purpose. The Court concludes that Congress had a rational basis for treating health insurance laws differently from the laws exempted in § 4(b)(3).

Congress could have recognized a greater need to accommodate state disability insurance laws because disabling illness and injury impose a double burden on their victims, who lose income as well as incur medical expenses. In contrast, workers who suffer from nondisabling illness and injury maintain a steady income, and medical expenses for treatment of nondisabling medical problems may usually be less than those expenses for disabling problems. The need to permit state regulation of employee benefit plans through disability insurance laws is arguably stronger than the state interest in health insurance laws.

Because Congress' concern about the costs to employers of complying with government regulation of benefit plans seems to have been premised on the voluntary nature of the plans, *see* p. 705, *supra,* the Court is uncertain whether minimizing the cost to interstate employers of compliance with state laws regulating types of benefits is a federal interest which ERISA was designed to further. If it is, the distinction between state health and disability insurance laws rationally furthers that interest. Premiums for health insurance may be larger than premiums for disability insurance for several reasons: Health benefits must be paid in a larger number of cases than disability benefits because health insurance policies protect against nondisabling as well as disabling illnesses and injuries; In cases of disabling injuries, the cost of medical care may often

exceed the cost of replacing income in view of the explosive increase in health care costs in the last decade; The amount of liability can be predicted more accurately where liability depends on previous income than where it depends on medical expenses beyond the knowledge and control of the employer, and this uncertainty also increases premium costs. Permitting state health insurance laws to continue to operate could seriously undermine the congressional goal of limiting the cost of employee benefit plans to employers.

Health insurance laws differ from disability insurance laws because of their novelty as well as because of their content. One major purpose of ERISA was to protect the interests of employees in benefit plans. Congress could reasonably conclude that established state regulatory schemes like workmen's compensation, unemployment compensation, and disability insurance comprehensively regulated the administration as well as the benefits of mandated plans and that they thereby adequately ensured the financial soundness of those plans. The Hawaii Act provides a good example of why that conclusion is less justified in the case of novel types of state social insurance laws. Hawaii goes out of its way to insist that it "does not regulate to ensure the honest administration of employee benefit plans." [13] This means that workers covered by plans required by the Hawaii Act lack the basic legal protections which ERISA was designed to provide concerning disclosure, reporting, funding, vesting, and fiduciary duties, if in fact the Hawaii Act is not preempted. Although the Hawaii Act is certainly not a "hastily contrived" state statute like some of the ones Congress intended to preempt, see Statement of Senator Javits, 120 Cong.Rec. 29942 (1974), quoted in *Hewlett-Packard Co. v. Barnes, supra,* 425 F.Supp. at 1299, there are significant gaps in the protection it provides—gaps

which ERISA was intended to close. Plans covered by the § 4(b)(3) exemption clause are exempt from all the requirements of ERISA, *see* Part IV, *supra,* and Congress did not intend to permit those essential minimum requirements to be avoided.

Novel types of state social insurance laws undermine the legislative goal of uniformity of regulation in ways that the more established of those laws do not. An important purpose of ERISA's preemption provision was to end conflicting regulation of plans of interstate employers. State laws like workmen's and unemployment compensation and disability insurance laws were first enacted long before ERISA, and diversity concerning those plans is the settled norm for interstate employers. Comparable adjustment to novel types of state social insurance laws has not been accomplished, and compliance with conflicting regulations of nontraditional types of state social insurance laws may impose significantly heavier burdens on interstate employers.

Preempting health insurance laws but not workmen's compensation, unemployment compensation, and disability insurance laws rationally furthers legitimate federal interest. Defendants may believe that permitting health insurance laws frustrates those federal interests far less than preempting them frustrates legitimate interests of the States. But they have failed to prove that Congress' balancing of the costs and benefits was irrational, and only if they make such a showing can the Court hold § 4(b)(3) of ERISA unconstitutional under the Due Process Clause.

Congress tried to accommodate the States' interests. Workmen's compensation, unemployment compensation, and disability insurance laws impose conflicting requirements on employee benefit plans of interstate employers and may sometimes

---

13. Defendants' Memorandum in Reply to Plaintiff's Opposition to Cross Motion for Summary Judgment, at 34. Defendants made this statement in their attempt to minimize the overlap between ERISA and the Hawaii Act. The State does protest a little too much, the Court thinks. Some provisions of the Hawaii Act do regulate the administration of health insurance plans. *See, e.g.,* § 393–14 (vesting of protection for new employees). The State is, however, substantially correct that the Hawaii Act does not attempt comprehensive regulation of administration of benefit plans.

provide less protection of financial soundness than ERISA. The inclusion of § 4(b)(3) demonstrates that Congress was willing to sacrifice its goals of uniformity and minimum protection to substantive state interests. Perhaps Congress should have been willing to accommodate further, but its decision to limit the exemption clause to workmen's compensation, unemployment compensation, and disability insurance laws was not irrational.

### B

By preempting state health insurance laws, Congress did not violate the limits placed by the Tenth Amendment on its authority under the Commerce Clause.

The Tenth Amendment imposes substantive limitations on Congress' power under the Commerce Clause.

> " 'While the Tenth Amendment has been characterized as a "truism," stating merely that "all is retained which has not been surrendered," *United States v. Darby,* 312 U.S. 100, 124, [61 S.Ct. 451, 462, 85 L.Ed. 609] (1941), it is not without significance. The Amendment expressly declares the constitutional policy that Congress may not exercise power in a fashion that impairs the States' integrity or their ability to function effectively in a federal system.' " *National League of Cities v. Usery,* 426 U.S. 833, 842–843, 96 S.Ct. 2465, 2470, 49 L.Ed.2d 245 (1976), *quoting Fry v. United States,* 421 U.S. 542, 547 n.7, 95 S.Ct. 1792, 44 L.Ed.2d 363 (1975).

Federal legislation which significantly impairs a State's ability to perform functions essential to its existence as a State, *National League of Cities v. Usery, supra,* 426 U.S. at 845, 96 S.Ct. 2465, transgresses the limits of the Tenth Amendment. The Court in *National League of Cities* drew a very clear distinction between "the authority of Congress to enact laws regulating individual businesses necessarily subject to the dual sovereignty of the Nation and of the State in which they reside" and "a similar exercise of congressional authority directed, not to private citizens, but to the States as States." *Id.* at 845, 96 S.Ct. at 2471. Defendants' argument requires the Court to hold that state regulation of private health insurance plans involves an essential and traditional function of state government, and this the Court cannot do.

Regulation of health insurance benefits available to workers is not a function like "fire prevention, police protection, sanitation, public health, and parks and recreation" which are "typical of those performed by state and local governments in discharging their dual functions of administering the public law and furnishing public services." *Id.,* at 851, 96 S.Ct., at 2474 (footnote omitted). Such regulation of private employment relationships is certainly part of the legitimate activity of the States, and the approach of cases like *Lochner v. New York,* 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905) (state maximum hour law unconstitutional), which sought to deny this power to the States, has long been abandoned. Nevertheless, although this country may have become more of what some call a welfare state, it still cannot be said that regulation of private employment relationships is a function "which governments are created to provide" or a service "which the States have traditionally afforded their citizens." *"National League of Cities v. Usery, supra,"* 426 U.S. at 851, 96 S.Ct. at 2474. ERISA regulates "the conduct of individual businesses necessarily subject to the dual sovereignty of the Nation and of the State in which they reside," *id.* at 845, 96 S.Ct. at 2471, and does not impair any essential attribute of state sovereignty.

Defendants make the novel argument that the Hawaii Act is an exercise of the taxing power because it requires employers to pay half of the health insurance premiums of their employees. Section 393–13. The power to tax is an essential function of the State with which the federal government cannot unreasonably interfere. But the Hawaii Act is not an exercise of that power. It is a peculiar type of tax indeed which requires the taxpayer to pay money not to the State but to another private taxpayer, and the Supreme Court has defined taxes as money "paid to the State

as a State." *Ill. Central R. R. v. Decatur,* 147 U.S. 190, 197, 13 S.Ct. 293, 293, 37 L.Ed. 132 (1892). Federal regulation of state taxes would undermine a State's "ability to function effectively in a federal system," *Fry v. United States, supra,* 421 U.S. at 547, 95 S.Ct. at 1796 n.7, because the ability to raise revenue is necessary to the performance of basic governmental services. The money which employers are required by the Hawaii Act to contribute for the health insurance premiums of their employees does not enable the state to perform traditional essential governmental functions.

In effect, defendants' contention means that if private parties must spend money in order to comply with state regulation, that regulation is an exercise of the state's taxing power and therefore immune from federal regulation. That the Hawaii Act specifies the expenditures which private employers must make in order to comply with the statute does not validly distinguish the Hawaii Act from state regulation which indirectly rather than directly requires substantial expenditures for compliance—defendants themselves argue that the touchstone of a tax is that it is mandatory, not that its amount is calculated according to a specified formula. Acceptance of defendants' argument would turn the Tenth Amendment into an unconditional bar to any federal statute preempting regulation of private activities because compliance with governmental regulation inevitably costs money. The Tenth Amendment was never intended to make federal preemption of state laws unconstitutional, and the Court will not give it that effect.

## VI

By enacting ERISA, Congress created a moratorium of indefinite length on the passage of health insurance laws. Congress could rationally have decided to take a different course. It troubles the Court, as it troubles defendants, that Congress preempted state health insurance laws apparently

without specific discussion of the need for such a step. The workers whom ERISA was primarily intended to protect may be better off with state health insurance laws than without them, and the efforts of states like Hawaii to ensure that their citizens have low-cost comprehensive health insurance may be significantly impaired by ERISA's preemption of health insurance laws. Federal legislators should heed the admonition that Justice Brandeis addressed to the federal courts:

> "To stay experimentation in things social and economic is a grave responsibility. Denial of the right to experiment may be fraught with serious consequences to the Nation. It is one of the happy incidents of the federal system that a single courageous State may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country." *New State Ice Co. v. Liebmann,* 285 U.S. 262, 311, 52 S.Ct. 371, 386–87, 76 L.Ed. 747 (1932) (Brandeis, J., dissenting).[14]

Although this social experiment of Hawaii may pose no "risk to the rest of the country," it does impose a burden on interstate commerce which Congress has the power to remove. Not the courts but the legislature possess the primary responsibility to balance the interests of the national economy against the interests of the federal system. The Constitution places limits on that balancing, but Congress has not crossed those limits here. Defendants' remedy, if a remedy is necessary, is not in this Court but in Congress.

IT IS HEREBY ORDERED that plaintiff's motion for summary judgment is granted.

IT IS HEREBY FURTHER ORDERED that defendants' motions for summary judgment and to transfer this action to the District of Hawaii are denied.

IT IS HEREBY FURTHER ORDERED that counsel for plaintiff shall prepare an

---

**14.** In fact, the Hawaii Act has been held up as a model for a national health insurance plan which the federal government should study.

*See* Appendix A to Defendants' Memorandum in Opposition to Plaintiff's Motion for Summary Judgment.

appropriate form of judgment, submit it to counsel for defendants for approval as to form, and submit it to the Court for execution within ten (10) days of the date of this order.