**FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| GOLDEN GATE RESTAURANT ASSOCIATION, an incorporated non-profit trade association, | No. 07-17370 |
| | D.C. No. CV-06-06997-JSW |
| Plaintiff - Appellee, | |
| v. | ORDER |
| CITY AND COUNTY OF SAN FRANCISCO, | |
| Defendant, | |
| and | |
| SAN FRANCISCO CENTRAL LABOR COUNCIL; SERVICE EMPLOYEES INTERNATIONAL UNION, HEALTHCARE WORKERS-WEST; SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 1021; UNITE HERE!, LOCAL 2, | |
| Defendant-Intervenors - Appellants. | |

| | |
|---|---|
| GOLDEN GATE RESTAURANT ASSOCIATION, an incorporated non-profit trade association, | No. 07-17372 |
| | D.C. No. CV-06-06997-JSW |

Plaintiff - Appellee,

v.

CITY AND COUNTY OF SAN FRANCISCO,

Defendant - Appellant,

and

SAN FRANCISCO CENTRAL LABOR COUNCIL; SERVICE EMPLOYEES INTERNATIONAL UNION, HEALTHCARE WORKERS-WEST; SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 1021; UNITE HERE!, LOCAL 2,

Defendant-Intervenors.

Appeal from the United States District Court
for the Northern District of California
Jeffrey S. White, District Judge, Presiding
Argued and Submitted January 3, 2008
Pasadena, California

Before: GOODWIN, REINHARDT, and W. FLETCHER, Circuit Judges

W. FLETCHER, Circuit Judge:

Plaintiff Golden Gate Restaurant Association ("the Association") challenges certain provisions of the newly enacted San Francisco Health Care Security

Ordinance ("the Ordinance"), contending that they are preempted by the federal Employee Retirement Income Security Act of 1974 ("ERISA"). Part of the Ordinance was scheduled to go into effect on January 1, 2008. On December 26, 2007, the district court granted summary judgment for the plaintiff and enjoined the implementation and enforcement of the disputed provisions of the Ordinance.

Defendant City and County of San Francisco ("the City") and Defendant-Intervernor labor unions have appealed the judgment of the district court. They ask us to stay the judgment of the district court, thereby allowing the Ordinance to go into effect pending our decision on the merits of their appeal. For the reasons that follow, we grant the stay.

## I. Procedural History

In July 2006, the San Francisco Board of Supervisors unanimously passed the San Francisco Health Care Security Ordinance, and the mayor signed it into law.[1] The Ordinance has been codified as City and County of San Francisco Administrative Code, Sections 14.1 to 14.8. On November 8, 2006, the Golden Gate Restaurant Association filed a complaint against the City in district court, seeking a declaration that the Ordinance's employer spending requirement is

---

[1] The text of the Ordinance is available at http://www.municode.com/content/4201/14131/HTML/ch014.html.

preempted by federal law, and a permanent injunction prohibiting implementation and enforcement of the provisions related to the requirement. On March 1, 2007, the San Francisco Central Labor Council, Service Employees International Union (SEIU) Local 1021, SEIU United Healthcare Workers-West, and UNITE-HERE! Local 2 (collectively "Intervenors") moved to intervene as defendants. The court granted the motion on April 5, 2007.

On April 2, 2007, the City amended the Ordinance to defer implementation of the employer provisions until January 1, 2008 for employers with fifty or more employees, and until April 1, 2008 for employers with twenty to forty-nine employees. On July 13, 2007, the parties filed cross-motions for summary judgment. The district court heard oral argument on the motions on November 2, 2007. On December 26, 2007, the district court entered judgment for the Association, holding that the Ordinance's employer spending requirement is preempted by ERISA.

On December 27, 2007, the City and Intervenors appealed to this court. On the same day, the City filed emergency motions in the district court and in this court for a stay of the district court's judgment pending decision on the merits of their appeal. On December 28, the district court denied the City's motion for a stay. The Association filed a memorandum in opposition to the motion for stay in

-4-

this court on December 31, 2007.  We heard oral argument in Pasadena, California, on January 3, 2008.

## II.  Standard for Granting Stay Pending Appeal

In *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987), the Supreme Court set forth "the factors regulating the issuance of a stay" as follows: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."  Consistent with these factors, we had previously articulated the standard for granting a stay pending appeal in *Lopez v. Heckler*, 713 F.2d 1432, 1435-36 (9th Cir. 1983).  *See also L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1200-01 (9th Cir. 1980).

In ruling on a motion for a stay pending appeal, we employ "two interrelated legal tests" that "represent the outer reaches of a single continuum."  *Lopez*, 713 F.2d at 1435 (internal quotation marks omitted).  "At one end of the continuum, the moving party is required to show both a probability of success on the merits and the possibility of irreparable injury."  *Id.*  We have recently applied, as an alternative test at this end of the continuum, a test originally formulated for granting a preliminary injunction:  "(1) a strong likelihood of success on the merits, [and] (2)

the possibility of irreparable injury to plaintiff if preliminary relief is not granted[.]" *Natural Res. Def. Council, Inc. v. Winter*, 502 F.3d 859, 862 (9th Cir. 2007). "At the other end of the continuum, the moving party must demonstrate that serious legal questions are raised and that the balance of hardships tips sharply in its favor." *Lopez*, 713 F.2d at 1435. "These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *Winter*, 502 F.3d at 862. Further, we "consider 'where the public interest lies' separately from and in addition to 'whether the applicant [for stay] will be irreparably injured absent a stay[.]" *Id.* at 863 (quoting *Hilton*, 481 U.S. at 776) (first alteration in *Winter*).

When the court decides the appeal of the district court's grant of summary judgment, it will review that decision *de novo*. *Aguilera v. Baca*, --- F.3d --- , No. 05-56617, 2007 WL 4531990, at *3, slip op. at 16795 (9th Cir. Dec. 27, 2007); *Cleghorn v. Blue Shield of Cal.*, 408 F.3d 1222, 1225 (9th Cir. 2005). We are mindful of that standard of review in determining the likelihood that the City and Intervenors will succeed on the merits of their appeal. *Cf. Lopez*, 713 F.2d at 1436.

The Association contends that the City must meet a higher standard than that articulated in *Lopez* and *Winter* because, in its view, a stay would change the status quo. We disagree that a higher standard applies.

-6-

First, the Supreme Court in *Hilton* did not include preservation of the status

quo among the "factors regulating the issuance of a stay." *See* 481 U.S. at 776; *see*

*also Abbassi v. INS*, 143 F.3d 513, 514 (9th Cir. 1998). Rather, the Court

recognized that "the traditional stay factors contemplate individualized judgments

in each case, [and] the formula cannot be reduced to a set of rigid rules." *Hilton*,

481 U.S. at 777. Maintaining the status quo is not a talisman. As the Fifth Circuit

wrote in *Canal Authority of Florida v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974):

> It must not be thought . . . that there is any particular magic in the phrase
> 'status quo.' The purpose of a preliminary injunction is always to prevent
> irreparable injury so as to preserve the court's ability to render a meaningful
> decision on the merits. It often happens that this purpose is furthered by
> preservation of the status quo, but not always. If the currently existing status
> quo itself is causing one of the parties irreparable injury, it is necessary to
> alter the situation so as to prevent the injury . . . . The focus always must be
> on prevention of injury by a proper order, not merely on preservation of the
> status quo.

*See also Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 809 (9th Cir. 1963)

(observing that the principle that a preliminary injunction should preserve the status

quo is "not to be understood as . . . [a] hard and fast rule[ ], to be rigidly applied to

every case regardless of its peculiar facts").

Second, despite the Association's argument to the contrary, granting a stay in

this case would, in a real sense, preserve rather than change the status quo. In the

absence of the district court injunction on December 26, 2007, the provisions of the

Ordinance that were scheduled to go into effect on January 1, 2008, would now be part of the status quo. As the D.C. Circuit has recognized, "it sometimes happens that the status quo is a condition not of rest, but of action, and the condition of rest is exactly what will inflict the irreparable injury upon complainant." *Friends for All Children, Inc. v. Lockheed Aircraft Corp.*, 746 F.2d 816, 830 n.21 (D.C. Cir. 1984) (internal quotation marks omitted); *see also Planned Parenthood of the Blue Ridge v. Camblos*, 116 F.3d 707, 721 (4th Cir. 1997) (Luttig, J.). Further, we note that several of our sister circuits, in reviewing preliminary injunctions enjoining implementation of new legislation, have granted motions for stays of those injunctions pending appeal without weighing whether a stay would disturb or preserve the status quo. *See, e.g.*, *Coal. to Defend Affirmative Action v. Granholm*, 473 F.3d 237, 244-53 (6th Cir. 2006); *Camblos*, 116 F.3d at 721.

## III. The Ordinance

The Ordinance mandates that covered employers make "required health care expenditures to or on behalf of" certain employees each quarter. S.F. Admin. Code § 14.3(a) (2007). "Covered employers" are employers engaging in business within the City that have an average of at least twenty employees performing work for compensation during a quarter, and non-profit corporations with an average of at least fifty employees performing work for compensation during a quarter. *Id*. §

-8-

14.1(b)(3), (11), (12). "Covered employees" are individuals who (1) work in the City, (2) work at least ten hours per week, (3) have worked for the employer for at least ninety days, and (4) are not excluded from coverage by other provisions of the Ordinance. *Id.* § 14.1(b)(2).

The Ordinance sets the required health care expenditure for employers based on the Ordinance's "health care expenditure rate." *Id.* §§ 14.1(b)(8), 14.3(a). For-profit employers with between twenty and ninety-nine employees and non-profit employers with fifty or more employees are required to make health care expenditures at a rate of $1.17 per hour. For-profit employers with one hundred or more employees are required to make expenditures at a rate of $1.76 per hour. *See* City & County of San Francisco, Office of Labor Standards Enforcement, Regulations Implementing the Employer Spending Requirement of the San Francisco Health Care Security Ordinance, Reg. 5.2(A) ("RIESR").[2] Under the Ordinance, "[t]he required health care expenditure for a covered employer shall be calculated by multiplying the total number of hours paid for each of its covered employees during the quarter . . . by the applicable health care expenditure rate." S.F. Admin. Code § 14.3(a).

---

[2] The Regulations are available at http://www.sfgov.org/site/uploadedfiles/olse/hcso/HCSO_Final_Regulations.pdf.

Regulations implementing the Ordinance specify that "[a] health care expenditure is any amount paid by a covered employer to its covered employees or to a third party on behalf of its covered employees for the purpose of providing health care services for covered employees or reimbursing the cost of such services for its covered employees." RIESR Reg. 4.1(A). A "covered employer has discretion as to the type of health care expenditure it chooses to make for its covered employees." RIESR Reg. 4.2(A). The Ordinance specifies that the definition of health care expenditures

> includ[es], but [is] not limited to
> (a) contributions by [a covered] employer on behalf of its covered employees to a health savings account as defined under section 223 of the United States Internal Revenue Code or to any other account having substantially the same purpose or effect without regard to whether such contributions qualify for a tax deduction or are excludable from employee income;
> (b) reimbursement by such covered employer to its covered employees for expenses incurred in the purchase of health care services;
> (c) payments by a covered employer to a third party for the purpose of providing health care services for covered employees;
> (d) costs incurred by a covered employer in the direct delivery of health care services to its covered employees; and
> (e) payments by a covered employer to the City to be used on behalf of covered employees. The City may use these payments to:
> > (i) fund membership in the Health Access Program for uninsured San Francisco residents; and
> > (ii) establish and maintain reimbursement accounts for covered employees, whether or not those covered employees are San Francisco residents.

-10-

S.F. Admin. Code § 14.1(b)(7) (paragraphing added); *see also* RIESR Reg. 4.2(A).

If an employer does not make required health care expenditures on behalf of employees in some other way, it must meet its spending requirement by making payments directly to the City under § 14.1(b)(7)(e). *See* RIESR Reg. 4.2(A). But an employer is exempt from making payments to the City if it makes health care expenditures under § 14.1(b)(7)(a)-(d) of at least $1.17 or $1.76 per hour (depending on the number of employees), and it is partially exempt to the extent that it makes lesser expenditures.

The Ordinance requires covered employers to "maintain accurate records of health care expenditures, required health care expenditures, and proof of such expenditures made each quarter each year," but it does not require them "to maintain such records in any particular form." S.F. Admin. Code § 14.3(b)(i). Employers must provide the City with "reasonable access to such records." *Id.* If an employer fails to comply with these requirements, the City will "presume[ ] that the employer did not make the required health expenditures for the quarter for which records are lacking, absent clear and convincing evidence otherwise." *Id.* § 14.3(b)(ii).

Relevant to our analysis, there are five categories of employers under the Ordinance. First are employers that have no ERISA plans ("No Coverage

Employers"). Second are employers that have ERISA plans for all employees, and that spend at least as much as the Ordinance's required health care expenditure per employee ("Full High Coverage Employers"). Third are employers that have ERISA plans for some, but not all, employees, and that spend at least as much as the Ordinance's required health care expenditure per employee for employees under the ERISA plan ("Selective High Coverage Employers"). Fourth are employers that have ERISA plans for all employees, but that spend less than the Ordinance's required health care expenditure per employee ("Full Low Coverage Employers"). Fifth are employers that have ERISA plans for some, but not all, employees, and that spend less than the Ordinance's required health care expenditure per employee for employees under the ERISA plan ("Selective Low Coverage Employers").

No Coverage Employers may choose to continue without any ERISA plans. In that event, they could make their required health care expenditures directly to the City. *See* RIESR Reg. 4.2(A)(6). If these employers choose to establish an ERISA plan, the Ordinance requires only that they make the required level of health care expenditures. They can do so by paying the full amount to the plan, or by paying part to the plan and part to the City. The Ordinance does not dictate which employees must be eligible, or what benefits must be provided by the plans. *See* RIESR Reg. 4.2(A)(1)-(5).

Full High Coverage Employers may choose to leave their ERISA plans intact and unaltered. So long as they maintain records to show that they are making the required health care expenditures, they will have complied in full with the Ordinance.

Selective High Coverage Employers may choose to maintain their existing ERISA plans intact and unaltered. For employees not covered by their ERISA plans, they could comply with the Ordinance by making the required health care expenditures to the City. *See* RIESR Reg. 6.2(C) ("An employer may . . . choose to purchase health insurance for its full-time employees, but make payment to the City to fund part-time employees' membership in the Health Access Program[.]").

Full Low Coverage Employers may choose to leave their ERISA plans intact and unaltered. In that event, they could comply with the Ordinance by increasing their payments to the City by the difference between their expenditures for the ERISA plans and the required health care expenditures under the Ordinance. *See* RIESR Reg. 6.2(D) ("[A]n employer who purchases a health insurance program with premiums that are less than the required expenditure . . . . may choose to pay the remainder to the City to establish and maintain medical reimbursement accounts for such employees.").

Selective Low Coverage Employers may choose to leave their ERISA plans intact and unaltered.  In that event, they could comply with the Ordinance for employees enrolled in their ERISA plans by paying to the City the difference between their expenditures for the plans and the required health care expenditures under the Ordinance, and for employees not enrolled in their ERISA plans by paying to the City the full amount of the required health care expenditures.

Two important features of the Ordinance are apparent from the foregoing: (1) The Ordinance does not require employers to establish ERISA plans or to make any changes to any existing ERISA plans.  Covered employers may fully satisfy the Ordinance by means other than establishing or changing ERISA plans, including by making payments to the City.  (2) The Ordinance requires that covered employers make certain levels of health care *payments* to an ERISA plan or to some other entity, including the City.  It does not require that employers provide certain health care *benefits* to their employees, through an ERISA plan or otherwise.

## IV.  Discussion

As we noted above, the standard for granting a stay is a continuum.  At one end of the continuum, if there is a "probability" or "strong likelihood" of success on the merits, a relatively low standard of hardship is sufficient.  *Lopez*, 713 F.2d at 1435; *Winter*, 502 F.3d at 862.  At the other end, if "the balance of hardships tips

-14-

sharply in . . . favor" of the party seeking the stay, a relatively low standard of likelihood of success on the merits is sufficient. *Lopez*, 713 F.2d at 1435. In this case, we hold both that there is a "probability" — indeed, a "strong likelihood" — of success on the merits, and that "the balance of hardships tips sharply in . . . favor" of the City and the Intervenors. We further hold that the public interest supports granting a stay.

## A. Success on the Merits

For the reasons that follow, we conclude that the City has shown not only a "probability of success on the merits," *Lopez*, 713 F.2d at 1435, but also a "strong likelihood of success on the merits." *Winter*, 502 F.3d at 862. The issue on the merits is whether the Ordinance's requirement that covered employers make a certain level of "health care expenditures" for their covered employees is preempted by ERISA.

The Supreme Court has instructed that there is a presumption against holding that ERISA preempts state or local laws regulating matters that fall within the traditional police powers of the State. "[W]here federal law is said to bar state action in fields of traditional state regulation, . . . we have worked on the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."

-15-

*Cal. Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.*

("*Dillingham*"), 519 U.S. 316, 325 (1997) (internal quotation marks omitted,

second alteration in *Dillingham*). "[T]he historic police powers of the State include

the regulation of matters of health and safety," including legislation targeting the

health care industry, *De Buono v. NYSA-ILA Med. & Clinical Servs. Fund*, 520 U.S.

806, 813 & n.10 (1997), as well as laws "regulat[ing] the employment relationship

to protect workers within the State," *DeCanas v. Bica*, 424 U.S. 351, 356 (1976).

"[N]othing in the language of [ERISA] or the context of its passage indicates that

Congress chose to displace general health care regulation, which historically has

been a matter of local concern." *N.Y. State Conference of Blue Cross & Blue Shield*

*Plans v. Travelers Ins. Co.*, 514 U.S. 645, 661 (1995); *see also Operating Eng'rs*

*Health & Welfare Trust Fund v. JWJ Contracting Co.*, 135 F.3d 671, 677 (9th Cir.

1998) ("[E]RISA pre-emption must have limits when it enters areas traditionally

left to state regulation — such as the state's . . . regulation of health . . . matters.").

Section 514(a) of ERISA preempts "any and all State laws insofar as they . . .

relate to any employee benefit plan" governed by ERISA. 29 U.S.C. § 1144(a). The

Court has established a two-part inquiry to interpret § 514(a): "A law 'relate[s] to' a

covered employee benefit plan for purposes of § 514(a) if it [1] has a connection

with or [2] reference to such a plan." *Dillingham*, 519 U.S. at 324 (alterations in

*Dillingham*) (some internal quotation marks omitted). We consider these two parts in turn.

### 1. "Connection with" a Plan

"[T]o determine whether a state law has the forbidden connection" with ERISA plans, we "look both to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive, as well as to the nature of the effect of the state law on ERISA plans." *Dillingham*, 519 U.S. at 325 (citations and internal quotation marks omitted). To do so, we employ a "holistic analysis guided by congressional intent." *Dishman v. UNUM Life Ins. Co. of Am.*, 269 F.3d 974, 981 n.15 (9th Cir. 2001); *see, e.g.*, *Egelhoff v. Egelhoff*, 532 U.S. 141, 147 (2001).

"The purpose of ERISA is to provide a uniform regulatory regime over employee benefit plans." *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004). The purpose of ERISA's preemption provision is to "ensure[ ] that the administrative practices of a benefit plan will be governed by only a single set of regulations." *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 11 (1987). In *Ingersoll-Rand Co. v. McClendon*, the Court explained that

> Section 514(a) was intended to ensure that plans and plan sponsors would be subject to a uniform body of benefits law; the goal was to minimize the administrative and financial burden of complying with conflicting directives

among States or between States and the Federal Government.  Otherwise, the inefficiencies created could work to the detriment of plan beneficiaries.

498 U.S. 133, 142 (1990).

In furtherance of ERISA's goal of ensuring that "plans and plan sponsors [are] subject to a uniform body of benefits laws," the Court in *Egelhoff v. Egelhoff*, 532 U.S. 141 (2001), struck down a Washington State law that directed a choice of beneficiary that conflicted with the choice provided in an ERISA plan.  The Court held that a state or local law has an impermissible "connection with" ERISA plans where it "binds ERISA plan administrators to a particular choice of rules for determining beneficiary status[,] . . . rather than [allowing administrators to pay the benefits] to those identified in the plan documents."  *Id.* at 147.  Similarly, in *Shaw v. Delta Air Lines*, 463 U.S. 85, 97-100 (1983), the Court held that state laws "which prohibit[ ] employers from structuring their employee benefit plans" in a particular manner or "which require[ ] employers to pay employees specific benefits" are preempted.

Consistent with these later-decided cases, in *Standard Oil Co. v. Agsalud*, 633 F.2d 760 (9th Cir. 1980), *aff'd*, 454 U.S. 801 (1981), we struck down a Hawaii statute that "require[d] employers in that state to provide their employees with a comprehensive prepaid health care plan."  *Id.* at 763.  As the district court noted, the

statute required that plan benefits include "a combination of features," and specifically "require[d] that the plans cover diagnosis and treatment of alcohol and drug abuse." *Standard Oil Co. v. Agsalud*, 442 F. Supp. 695, 696, 704 (N.D. Cal. 1977). The statute also imposed "certain reporting requirements which differ[ed] from those of ERISA." *Id.* at 696. In affirming the district court's opinion holding the Hawaii statute preempted under ERISA, we emphasized that the statute "directly and expressly regulate[d] employers and *the type of benefits they provide* employees," and that it therefore "related to" ERISA plans under § 514(a). *Agsalud*, 633 F.2d at 766 (emphasis added). That is, the Hawaii statute was preempted because it required employers to have health plans, and it dictated the specific benefits employers must provide through those plans. *Id.* The statute thereby impeded ERISA's goal of ensuring that "plans and plan sponsors would be subject to a uniform body of benefits law." *Fort Halifax Packing Co.*, 498 U.S. at 142.

The Ordinance in this case stands in stark contrast to the laws struck down in *Egelhoff*, *Shaw* and *Agsalud*. The Ordinance does not require any employer to adopt an ERISA plan or other health plan. Nor does it require any employer to provide specific benefits through an existing ERISA or other health plan. Any employer covered by the Ordinance may fully discharge its expenditure obligations

by making the required level of employee health care expenditures, whether those expenditures are made in whole or in part to an ERISA plan, or in whole or in part to the City. The Ordinance thus preserves ERISA's "uniform regulatory regime." *See Aetna Health Inc.*, 542 U.S. at 208. The Ordinance also has no effect on "the administrative practices of a benefit plan," *Fort Halifax Packing Co.*, 482 U.S. at 11, unless an employer voluntarily elects to change those practices.

A covered employer may choose to adopt or to change an ERISA plan in lieu of paying the required health care expenditures to the City. An employer may be influenced by the Ordinance to do so because, when faced with an unavoidable obligation to make the required health care expenditure, it may prefer to make that expenditure to an ERISA plan. As *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Insurance Co.*, 514 U.S. 645 (1995), makes clear, such influence is entirely permissible.

In *Travelers*, a New York statute required hospitals to collect surcharges from patients covered by commercial insurance companies, including those administering ERISA plans, but not from patients covered by Blue Cross/Blue Shield plans. The difference in treatment was justified on the ground that "the Blues pay the hospitals promptly and efficiently and, more importantly, provide coverage for many subscribers whom the commercial insurers would reject as

unacceptable risks." *Id.* at 658. The Court recognized that the surcharge might have an influence on "choices made by insurance buyers, including ERISA plans." *Id.* at 659. But such an influence was not fatal to the New York statute:

> An indirect economic influence . . . does not bind plan administrators to any particular choice and thus function as a regulation of an ERISA plan itself[.] . . . Nor does the indirect influence of the surcharges preclude uniform administrative practice[.]

*Id.* at 659-60.

In this case, the influence exerted by the Ordinance is even more indirect than the influence in *Travelers*. In *Travelers*, the required surcharge on benefits provided under ERISA plans administered by commercial insurers inescapably changed the cost structure for those plans' health care benefits and thereby exerted economic pressure on the manner in which the plans would be administered. Here, by contrast, the Ordinance does not regulate benefits or charges for benefits provided by ERISA plans. Its only influence is on the employer who, because of the Ordinance, may choose to make its required health care expenditures to an ERISA plan rather than to the City.

Further, the Ordinance does not "bind[ ] ERISA plan administrators to a particular choice of rules" for determining plan eligibility or entitlement to particular benefits. *See Egelhoff*, 532 U.S. at 147. Employers may "structur[e] their

employee benefit plans" in a variety of ways and need not "pay employees specific benefits." *See Shaw*, 463 U.S. at 97. The Ordinance would "leave plan administrators right where they would be in any case." *Travelers Ins. Co.*, 514 U.S. at 662. *See also WSB Elec., Inc. v. Curry*, 88 F.3d 788, 793 (9th Cir. 1996) ("The scheme does not force employers to provide any particular employee benefits or plans, to alter their existing plans, or to even provide ERISA plans or employee benefits at all."); *Keystone Chapter, Associated Builders & Contractors, Inc. v. Foley*, 37 F.3d 945, 960 (3d Cir. 1994) ("Where a legal requirement may be easily satisfied through means unconnected to ERISA plans, and only relates to ERISA plans at the election of an employer, it affects employee benefit plans in too tenuous, remote, or peripheral a manner to warrant a finding that the law 'relates to' the plan." (some internal quotation marks omitted)).

Finally, the Ordinance does not impose on plan administrators any "administrative [or] financial burden of complying with conflicting directives" relating to benefits law. *Ingersoll-Rand Co.*, 498 U.S. at 142. The Ordinance does impose an administrative burden on covered employers, for they must keep track of their obligations to make payments on behalf of covered employees and must maintain records to show that they have complied with the Ordinance. But these burdens exist whether or not a covered employer has an ERISA plan. Thus, they

-22-

are burdens on the employer rather than on an ERISA plan. *See WSB Elec., Inc.*, 88 F.3d at 795 (rejecting the argument that a law "is preempted because it imposes additional administrative burdens regarding benefits contributions on *the employer*," where it did "not impose any additional burden on ERISA plans or require the employer to take any action with regard to those plans" (emphasis in original)).

## 2. "Reference to" a Plan

To determine whether a law has a forbidden "reference to" ERISA plans, we ask whether (1) the law "acts immediately and exclusively upon ERISA plans," or (2) "the existence of ERISA plans is essential to the law's operation." *Dillingham*, 519 U.S. at 325.

It is highly unlikely that the Ordinance is preempted under the first part of the inquiry, as may be seen from *Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825 (1988). In *Mackey*, the Court held that ERISA preempted a provision of a state garnishment statute that specifically exempted ERISA benefits from the operation of the statute, even while the statute subjected other assets to garnishment. *Id.* at 828-29. The Court noted that the provision "solely applie[d] to" ERISA plans, and "single[d] out ERISA . . . plans for different treatment under state" law. *Id.* at 829-30. At the same time, however, the Court upheld those

-23-

aspects of the state statute that did "not single out or specially mention ERISA plans of any kind," even though they would potentially subject ERISA plans to "substantial administrative burdens and costs." *Id.* at 831. In *Dillingham*, the Court characterized the preempted statute in *Mackey* as "act[ing] immediately and exclusively upon ERISA plans." *Dillingham*, 519 U.S. at 325. Here, unlike the preempted statute in *Mackey*, the Ordinance does not act on ERISA plans at all, let alone immediately and exclusively.

It is also highly unlikely that the Ordinance is preempted under the second part of the inquiry, as may be seen from two cases. The first is *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 140 (1990), in which the Court held that ERISA preempted a state law that "ma[de] specific reference to, and indeed [wa]s premised on, the existence of" an ERISA plan. In order for a party to bring a claim under that state law, "a plaintiff must plead, and the court must find, that an ERISA plan exists." *Id.* Here, by contrast, the Ordinance can have its full force and effect even if no employer in the City has an ERISA plan. If there is no ERISA plan, covered employers can discharge their obligation under the Ordinance simply by making their required health care expenditures to the City.

The second case is *District of Columbia v. Greater Washington Board of Trade*, 506 U.S. 125 (1992). A local ordinance required employers to provide

workers' compensation benefits "measured by reference to 'the existing health insurance coverage' provided by the employer," and required that the coverage "'be at the same benefit level'" as the existing coverage. *Id.* at 130. The Court held that the ordinance contained an impermissible "reference to" an ERISA plan because its requirement was measured by reference to the level of benefits provided by the employee's ERISA plan.

The district court in this case relied on the Court's opinion in *Greater Washington* in holding that the Ordinance is preempted. The district court wrote, "By mandating employee health benefit structures and administration, [the Ordinance's health care expenditure requirements] interfere with preserving employer autonomy over whether and how to provide employee health coverage, and ensuring uniform national regulation of such coverage." Further, according to the district court, "The provisions [of the Ordinance] require private employers to meet a certain level of benefits; and those benefits are the type regularly provided by employer ERISA plans." The district court concluded, "This Court finds that [the structure of the Ordinance] is akin to the statute the Supreme Court found preempted in *District of Columbia v. Greater Washington Board of Trade* which required the employer to provide the same amount of health care coverage for workers eligible for workers compensation."

There is a critical distinction between the ordinance in *Greater Washington* and the Ordinance in this case. Under the ordinance in *Greater Washington*, obligations were measured by reference to the level of *benefits* provided by the ERISA plan to the employee. Under the Ordinance in our case, by contrast, an employer's obligations to the City are measured by reference to the *payments* provided by the employer to an ERISA plan or to another entity specified in the Ordinance, including the City. The employer calculates its required payments based on the hours worked by its employees, rather than on the value or nature of the benefits available to ERISA plan participants. Thus, unlike the ordinance in *Greater Washington*, the Ordinance in our case is not determined, in the words of § 514(a), by "reference to" an ERISA plan.

The Ordinance in our case is conceptually similar to a California prevailing wage statute challenged in *WSB Electric, Inc. v. Curry*, 88 F.3d 788 (9th Cir. 1996). In that case, the California statute required an employer to pay the prevailing wage, consisting of a combination of cash and benefits. To calculate the total wage, the employer added the hourly cash wage to its hourly contribution to the employee's benefit package. However, the statute required that a certain minimum amount be paid as a cash wage, which had the effect of putting a cap on the amount the employer could be credited for payments for a benefit package. The employer was

free to contribute more than the cap amount to a benefit package, but any amount above the cap was not counted toward satisfaction of the prevailing wage requirement. *Id.* at 790-91.

The plaintiffs in *WSB Electric* contended that the California statute was preempted by ERISA, pointing out that some of the employers were making payments to ERISA plans, and that benefits were paid out to the employees under these plans. *Id.* at 792-93. We held, however, that the statute was not preempted. We wrote:

> At most, this scheme provides examples of the types of employer contributions to benefits that are included in the wage calculation. The scheme does not force employers to provide any particular employee benefits or plans, to alter their existing plans, or to even provide ERISA plans or employee benefits at all. These provisions are enforced regardless of whether the individual employer provides benefits through ERISA plans, or whether the benefit contributions in a given locality are paid to ERISA plans.

*Id.* at 793-94. Here, as in *WSB Electric*, employers need not have any ERISA plan at all; and if they do have such a plan, they need not make any changes to it. Where a law is fully functional even in the absence of a single ERISA plan, as it was in *WSB Electric* and as it is in this case, we have great difficulty in seeing how the law makes an impermissible reference to ERISA plans. *Cf. Travelers Ins. Co.*, 514 U.S. at 656 ("The surcharges are imposed upon patients and HMO's, regardless of whether the commercial coverage or membership, respectively, is ultimately

secured by an ERISA plan, private purchase, or otherwise, with the consequence that the surcharge statutes cannot be said to make 'reference to' ERISA plans in any manner.").

## V. Balance of Hardships

If we deny the stay and establish the expedited briefing schedule to which the City and the Association have agreed, this court will be able to hear oral arguments on the appeal in April or May at the soonest, and will issue a ruling sometime thereafter. Therefore, we consider the relative hardships during that period. If the stay were denied, implementation of the employer spending provisions for employers with fifty or more employees would be delayed for several months, and implementation of those provisions for smaller employers would also be delayed, although for a shorter period. *See* S.F. Admin. Code § 14.8.

The City estimates that approximately 20,000 uninsured San Francisco workers will become newly eligible for health benefits if and when the employer payment mandate under the Ordinance is fully implemented. Neither side has told us how many of those individuals work for employers with fifty or more employees, but it is safe to assume that a reasonable number of them work for such employers and would therefore become covered employees as of January 1, 2008 if the Ordinance is permitted to go into effect. The remainder would become covered

employees as of April 1, 2008. An undetermined number of these employees are represented by Intervenors.

It is uncontested that individuals without health coverage are significantly less likely to seek timely medical care than those with health coverage. Lack of timely access to health care poses serious health risks. The City has provided evidence that some individuals who lack health care coverage have serious, chronic health conditions that currently go untreated. It has also provided evidence that individuals who have recently enrolled in the Health Access Program established under the Ordinance have begun to receive preventive care, medication, and other treatment for previously neglected illnesses and injuries. It is clear that otherwise avoidable human suffering, illness, and possibly death will result if a stay is denied.

In addition, the City will incur some otherwise avoidable financial costs if a stay is denied, for some individuals who would otherwise be covered under the Ordinance will seek emergency treatment from San Francisco General Hospital or City health clinics.

The Association represents restaurants, as well as other culinary employers, throughout San Francisco. Many of the Association's members are covered employers under the Ordinance. At least some of the Association's members have more than fifty employees and would be required to comply with the Ordinance as

-29-

of January 1, 2008. If we were to grant a stay, those employers would be required to make at least one quarterly payment on behalf of their covered employees prior to this court's resolution of the appeal. Those employers would also face several months of administrative burdens pending appeal. Depending on the nature of the employer's workforce, those burdens may include maintaining records documenting current health care expenditures per employee, differentiating between hours worked inside and outside the City, calculating the percentage of paid time off attributable to time worked inside and outside the City, and determining whether particular employees are "managerial, supervisorial, or confidential" under the Ordinance. *See* S.F. Admin. Code §§ 14.1(b)(2)(d), 14.3(b); RIESR Reg. §§ 3.1(C)(1), 3.2(A)(1), 6.1(C)(1), 7.1. Employers with between twenty and forty-nine employees would be required to bear these administrative burdens as of April 1, 2008, and would be required to make their first quarterly payment by the end of June.

We conclude that the balance of hardships tips sharply in favor of the City and the Intervenors. "Faced with . . . a conflict between financial concerns and preventable human suffering, we have little difficulty concluding that the balance of hardships tips decidedly" in favor of the latter. *Lopez*, 713 F.2d at 1437. When considering potential human suffering, we take into account whether "[r]etroactive

restoration of benefits would be inadequate to remedy these hardships" because the affected individuals possess limited resources and could face "economic hardship, suffering or even death" if a stay were not granted pending appeal. *Id.* While the City's and Association's injuries are entirely economic, the Intervenors' injuries include preventable human suffering. Therefore, the balance of hardships tips sharply in favor of the parties seeking relief.

## VI. The Public Interest

Our analysis of the public interest in a stay is in part subsumed in our analysis of the balance of hardship to the parties. That analysis, however, is necessarily narrower than a public interest analysis, for there are many employees covered by the Ordinance who are not parties to this suit. In considering the public interest, we may consider the hardship to all individuals covered by the Ordinance, not limited to parties, as well as the indirect hardship to their friends and family members, if a stay is denied. Similarly, we may consider the hardship to all covered employers, not limited to employers represented by the Association, as well as indirect hardship to those affected by hardship to the employers.

In addition, the general public has an interest in the health of San Francisco residents and workers, particularly those workers who handle their food and work in other service industries. Health care providers in San Francisco also stand to benefit

-31-

from the Ordinance, both because more individuals with health insurance will use their services, and because fewer individuals will burden their emergency care divisions. Because the Ordinance will likely increase the use of more cost-effective preventive care, as compared with more expensive emergency care, overall health care expenses may decrease.

Further, the general public has a financial interest in receiving low-cost goods and services from employers. To the extent that employers will pass along the costs of compliance to their customers, those customers will be adversely affected. It is possible that some covered San Francisco employers may elect to move elsewhere to avoid the costs of compliance, and some consumers may choose to visit restaurants and other establishments outside the City, where goods and services may be less expensive. But the degree to which these possibilities may become reality is highly speculative.

Finally, our consideration of the public interest is constrained in this case, for the responsible public officials in San Francisco have already considered that interest. Their conclusion is manifested in the Ordinance that is the subject of this appeal. The San Francisco Board of Supervisors passed it unanimously, and the mayor signed it. *See* 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948.4, at 207 (2d ed. 1995) ("The public

interest may be declared in the form of a statute."). We are not sure on what basis a court could conclude that the public interest is not served by an ordinance adopted in such a fashion. Perhaps it could so conclude if it were obvious that the Ordinance was unconstitutional or preempted by a duly enacted federal law, in which elected federal officials had balanced the public interest differently; but, as evidenced by our analysis above, we think the opposite is likely to be held true in this case. *See Burford v. Sun Oil Co.*, 319 U.S. 315, 318 (1943) ("[I]t is in the public interest that federal courts of equity should exercise their discretionary power with proper regard for the rightful independence of state governments in carrying out their domestic policy." (internal quotation marks omitted)).

We therefore conclude that the public interest is served by granting a stay of the district court's order pending the resolution of the appeal on the merits.

## VII. Conclusion

There may be better ways to provide health care than to require private employers to foot the bill. But our task is a narrow one, and it is beyond our province to evaluate the wisdom of the Ordinance now before us. We are asked only whether we should stay the judgment of the district court pending resolution of the appeal on the merits. We conclude that the City and Intervenors have a probability, even a strong likelihood, of success in their argument that the Ordinance is not

preempted by ERISA.  We further conclude that the balance of hardships tips sharply in favor of the City and the Intervenors.  Finally, we conclude that the public interest will be served by a stay.  We therefore order that the district court's judgment be stayed pending resolution of the appeal.

So ordered.

COUNSEL LISTING

Richard C. Rybicki, DICKENSON, PEATMAN & FOGARTY, Napa, CA

Patrick Sutton, DICKENSON, PEATMAN & FOGARTY, Santa Rosa, CA

for Plaintiff-Appellee

Vince Chhabria, OFFICE OF THE CITY ATTORNEY, San Francisco, CA

for Defendant-Appellant

Stacey M. Leyton, Stephen P. Berzon

ALTSHULER BERZON, San Francisco, CA

for Defendant-Intervenors-Appellants