# SUPREME COURT OF THE UNITED STATES

No. 23A814

UNITED STATES *v.* TEXAS, ET AL.

ON APPLICATION TO VACATE STAY

No. 23A815

LAS AMERICAS IMMIGRANT ADVOCACY CENTER, ET AL. *v.* STEVEN McCRAW, DIRECTOR, TEXAS DEPARTMENT OF PUBLIC SAFETY, ET AL.

ON APPLICATION TO VACATE STAY

[March 19, 2024]

The applications to vacate stay presented to JUSTICE ALITO and by him referred to the Court are denied. The orders heretofore entered by JUSTICE ALITO are vacated.

JUSTICE BARRETT, with whom JUSTICE KAVANAUGH joins, concurring in denial of applications to vacate stay.

If the Fifth Circuit had issued a stay pending appeal, this Court would apply the four-factor test set forth in *Nken* v. *Holder*—including, as relevant in this Court, an assessment of certworthiness—to decide whether to vacate it. 556 U. S. 418, 434 (2009); *Does 1–3* v. *Mills*, 595 U. S. ___, ___ (2021) (BARRETT, J., concurring in denial of application for injunctive relief ). But the Fifth Circuit has *not* entered a stay pending appeal. Instead, in an exercise of its docket-management authority, it issued a temporary administrative stay and deferred the stay motion to a merits panel, which is considering it in conjunction with Texas's challenge to the District Court's injunction of S. B. 4. Thus, the Fifth Circuit has not yet rendered a decision on whether a

stay pending appeal is warranted. That puts this case in a very unusual procedural posture.

Administrative stays do not typically reflect the court's consideration of the merits of the stay application. Rather, they "freeze legal proceedings until the court can rule on a party's request for expedited relief." R. Bayefsky, Administrative Stays: Power and Procedure, 97 Notre Dame L. Rev. 1941, 1942 (2022) (Bayefsky). Deciding whether to grant a stay pending appeal requires consideration of the four *Nken* factors, which include an assessment of the applicant's likelihood of success on the merits. That is not always easy to evaluate in haste, and an administrative stay buys the court time to deliberate.[1] In *June Medical Services, L.L.C.* v. *Gee*, for example, this Court stayed the issuance of the lower court's mandate "[b]ecause the filings regarding the application for a stay in this matter were not completed until earlier today and the Justices need time to review these filings." 586 U. S. ___, ___ (2019). At the same time, we stressed that the administrative stay reflected no view of the underlying merits. *Ibid. June Medical* is not an outlier. After receiving an emergency application, this Court frequently issues an administrative stay to permit time for briefing and deliberation—as JUSTICE ALITO did in this very case. 601 U. S. ___ (2024). See also, *e.g., Murthy* v. *Missouri*, 600 U. S. ___ (2023); *Yeshiva Univ.* v. *YU Pride Alliance*, 597 U. S. ___ (2022). The courts of appeals use the procedure to the same end. See, *e.g., Trump* v. *Vance*, 2019 WL 5703884 (CA2, Oct. 7, 2019); *United States* v. *McGowan*, 2020 WL 3867418 (CA6, June 28, 2020); *Brady* v. *National Football League*, 638 F. 3d 1004 (CA8 2011); *Al Otro Lado* v. *Wolf*, 945 F. 3d 1223 (CA9 2019); *Cobell* v. *Norton*, 2004 WL 603456 (CADC, Mar. 24, 2004) (*per curiam*);

---

[1] While we have not explained the source of a federal court's authority to enter an administrative stay, commentators have pointed to a court's inherent authority to manage its docket, as well as to the All Writs Act, 28 U. S. C. §1651. Bayefsky 1960–1964.

*Marine Polymer Technologies, Inc.* v. *HemCon, Inc.*, 395 Fed. Appx. 701 (CA Fed. 2010).

That such stays are "administrative" does not mean they are value neutral. Their point is to minimize harm while an appellate court deliberates, so the choice to issue an administrative stay reflects a first-blush judgment about the relative consequences of staying the lower court judgment versus allowing it go to into effect.[2] Take this case. Texas argues that the District Court's injunction of S. B. 4 prevents it from addressing an escalating crisis at the border; the United States argues that S. B. 4 undermines foreign relations and injures its sovereign interest in enforcing federal law, including those provisions granting certain migrants reprieve from removal.[3] In the end, the Fifth Circuit might decide that the *Nken* factors favor the United States and decline to stay the injunction pending appeal. But for the brief period of uncertainty—*i.e.*, the time it takes the court to deliberate—the Fifth Circuit apparently concluded

───────────

[2] Courts (including this Court) have sometimes described stays as devices meant to maintain the status quo. See, *e.g.*, *Nken* v. *Holder*, 556 U. S. 418, 429 (2009) ("A stay 'simply suspend[s] judicial alteration of the status quo.'" (quoting *Ohio Citizens for Responsible Energy, Inc.* v. *NRC*, 479 U. S. 1312, 1313 (1986) (Scalia, J., in chambers))). That is a tricky metric, because there is no settled way of defining "the status quo." See Bayefsky 1945 ("[I]t is not always easy to ascertain what counts as the status quo"). Compare *Prometheus Radio Project* v. *F.C.C.*, 2003 WL 22052896, *1 (CA3, Sept. 3, 2003) (*per curiam*); *Doe #1* v. *Trump*, 944 F. 3d 1222, 1223 (CA9 2019) (defining status quo as the state of affairs prior to the challenged law or rule), with *Veasey* v. *Abbott*, 870 F. 3d 387, 392 (CA5 2017) (*per curiam*); *Golden Gate Restaurant Assn.* v. *City and Cty. of San Francisco*, 512 F. 3d 1112, 1116–1117 (CA9 2008) (defining status quo as the state of affairs prior to judicial intervention). The "status quo" in this case is not self-evident. Is it the day before Texas enacted S. B. 4? The day before the lawsuit was filed? The day Texas's appeal and stay motion was docketed in the Fifth Circuit?

[3] The private applicants argue that S. B. 4 will increase the cost of operating their organizations.

that the consequences of erroneously enjoining the enforce-
ment of S. B. 4 would be worse than those of erroneously
lifting the injunction.

"Minimizing the harm" is not necessarily the exclusive
justification for an administrative stay. Because an admin-
istrative stay precedes a ruling on a stay pending appeal,
the *Nken* factors are obviously on the court's radar, and un-
surprisingly, they can influence the stopgap decision, even
if they do not control it. Thus, for example, judges have
cited the underlying merits as a reason to grant an admin-
istrative stay. *United States* v. *Texas*, 595 U. S. \_\_\_, \_\_\_
(2021) (SOTOMAYOR, J., concurring in part and dissenting
in part); *BST Holdings, L.L.C.* v. *OSHA*, 2021 WL 5166656,
\*1 (CA5, Nov. 6, 2021) (*per curiam*); *National Urban League*
v. *Ross*, 977 F. 3d 698, 705 (CA9 2020) (Bumatay, J., dis-
senting) ("We should have granted an administrative stay
here because defendants are likely to succeed on the mer-
its"). But such orders rarely generate opinions, which
means that there is no jurisprudence of administrative
stays, much less a one-size-fits-all test that courts apply be-
fore entering one. That does not strike me as a problem:
Play in the joints seems appropriate for a measure that
functions as a flexible, short-term tool.

So far as I know, this Court has never reviewed the deci-
sion of a court of appeals to enter—or not enter—an admin-
istrative stay. I would not get into the business. When en-
tered, an administrative stay is supposed to be a short-lived
prelude to the main event: a ruling on the motion for a stay
pending appeal. I think it unwise to invite emergency liti-
gation in this Court about whether a court of appeals
abused its discretion at this preliminary step—for example,
by misjudging whether an administrative stay is the best
way to minimize harm while the court deliberates.

The real problem—and the one lurking in this case—is
the risk that a court will avoid *Nken* for too long. An ad-
ministrative stay should last no longer than necessary to

make an intelligent decision on the motion for a stay pending appeal. Once the court is equipped to rule, its obligation to apply the *Nken* factors is triggered—a point that some judges have pressed their Circuits to consider. See, *e.g.*, *Doe #1*, 944 F. 3d, at 1226 (Bress, J., dissenting); *National Urban League*, 977 F. 3d, at 705, n. 5 (Bumatay, J., dissenting). The United States suggests that, on several occasions, the Fifth Circuit has allowed administrative stays to linger for so long that they function like stays pending appeal. Application to Vacate Stay 15, n. 3.

The time may come, in this case or another, when this Court is forced to conclude that an administrative stay has effectively become a stay pending appeal and review it accordingly. But at this juncture in this case, that conclusion would be premature. The applicants' opposition to the administrative stay included a request that any such stay itself be stayed for seven days pending an application to this Court, and the Fifth Circuit granted that request in its order. It is surprising that both the parties and the panel contemplated from the start that this Court might review an administrative stay. Before this Court intervenes on the emergency docket, the Fifth Circuit should be the first mover: It should apply the *Nken* factors and decide the motion for a stay pending appeal. It can presumably do so promptly. Texas's motion for a stay pending appeal was fully briefed in the Fifth Circuit by March 5, almost two weeks ago. Merits briefing on Texas's challenge to the District Court's injunction of S. B. 4 is currently underway. If a decision does not issue soon, the applicants may return to this Court.

# SUPREME COURT OF THE UNITED STATES

————

No. 23A814

————

UNITED STATES *v.* TEXAS, ET AL.

ON APPLICATION TO VACATE STAY

————

No. 23A815

————

LAS AMERICAS IMMIGRANT ADVOCACY CENTER,
ET AL. *v.* STEVEN McCRAW, DIRECTOR, TEXAS
DEPARTMENT OF PUBLIC SAFETY, ET AL.

ON APPLICATION TO VACATE STAY

[March 19, 2024]

JUSTICE SOTOMAYOR, with whom JUSTICE JACKSON joins,
dissenting from denial of applications to vacate stay.

Today, the Court invites further chaos and crisis in im-
migration enforcement. Texas passed a law that directly
regulates the entry and removal of noncitizens and explic-
itly instructs its state courts to disregard any ongoing fed-
eral immigration proceedings. That law upends the federal-
state balance of power that has existed for over a century,
in which the National Government has had exclusive au-
thority over entry and removal of noncitizens. The District
Court here declared that Texas's law amounts to "nullifica-
tion of federal law and authority—a notion that is antithet-
ical to the Constitution and has been unequivocally rejected
by the federal courts since the Civil War." 2024 WL 861526,
*1 (WD Tex., Feb. 29, 2024).

Texas appealed that ruling and sought to begin enforcing
its law while it appeals. With no reasoned analysis, the
Court of Appeals issued an administrative order allowing it

to do so.  Texas can now immediately enforce its own law imposing criminal liability on thousands of noncitizens and requiring their removal to Mexico.  This law will disrupt sensitive foreign relations, frustrate the protection of individuals fleeing persecution, hamper active federal enforcement efforts, undermine federal agencies' ability to detect and monitor imminent security threats, and deter noncitizens from reporting abuse or trafficking.

The Court gives a green light to a law that will upend the longstanding federal-state balance of power and sow chaos, when the only court to consider the law concluded that it is likely unconstitutional.  This law implicates serious issues that are subject to ongoing political debate, and Texas's novel scheme requires careful and reasoned consideration in the courts to determine which provisions may be unconstitutional.  Although the Court today expresses no view on whether Texas's law is constitutional, and instead defers to a lower court's management of its docket, the Court of Appeals abused its discretion by entering an unreasoned and indefinite administrative stay that altered the status quo.  This Court stands idle.  Because I cannot, I dissent.

## I
### A

"The Government of the United States has broad, undoubted power over the subject of immigration and the status of [noncitizens]."  *Arizona* v. *United States*, 567 U. S. 387, 394 (2012).  That power is near exclusive when it comes to the admission and removal of noncitizens, and it precludes States from regulating entry and removal in a patchwork across the Nation.  "It is fundamental that foreign countries concerned about the status, safety, and security of their nationals in the United States must be able to confer and communicate on this subject with one national sovereign, not the 50 separate States."  *Id.*, at 395.  Congress

has enacted a comprehensive and detailed scheme concerning the entry and removal of noncitizens. See, *e.g.*, 8 U. S. C. §1229a(a)(3) (federal removal proceedings are "the sole and exclusive procedure for determining whether [a noncitizen] may be admitted to the United States or, if the [noncitizen] has been so admitted, removed from the United States").

Over a century of this Court's precedent confirms that the "authority to control immigration—to admit or exclude [noncitizens]—is vested solely in the Federal Government." *Truax* v. *Raich*, 239 U. S. 33, 42 (1915). "[T]he removal process is entrusted to the discretion of the Federal Government," because removal decisions "touch on foreign relations and must be made with one voice." *Arizona*, 567 U. S., at 409.

### B

Texas Senate Bill 4 (S. B. 4) permits the State to arrest and remove to Mexico noncitizens who enter, attempt to enter, or reside in Texas, while instructing state courts to disregard any ongoing federal immigration proceedings. See S. B. 4, 88th Leg., 4th Called Sess. (2023). As the Governor of Texas declared, S. B. 4 embodies Texas's view that its constitutional authority "is the supreme law of the land and supersedes any federal statutes to the contrary." Governor Greg Abbott, Press Release, Statement on Texas's Constitutional Right to Self-Defense (Jan. 24, 2024).

Specifically, S. B. 4 makes it a crime for a noncitizen to "ente[r] or attemp[t] to enter [Texas] directly from a foreign nation at any location other than a lawful port of entry." Tex. Penal Code Ann. §51.02(a) (West 2024). It also makes it a crime for a noncitizen to "ente[r], attemp[t] to enter," or be found in Texas after previously having been "denied admission to or excluded, deported, or removed from the United States," or having "departed from the United States while an order of . . . removal [wa]s outstanding." §51.03(a).

These crimes are punishable by thousands of dollars in fines and up to one year in prison. §51.03(b).

Once Texas charges a noncitizen under S. B. 4, a state judge may, with the consent of the noncitizen, enter an order that "require[s] the person to return to the foreign nation from which the person entered or attempted to enter" before any conviction. Tex. Code Crim. Proc. Ann., Art. 5B.002(a)–(c) (Vernon 2024). Once a noncitizen is convicted under S. B. 4, however, the judge "shall enter" an "order requiring the person to return to the foreign nation from which the person entered or attempted to enter" after he completes his state prison sentence. Art. 5B.002(d). Failure to comply with these state removal orders is a second-degree felony punishable by up to 20 years in prison. Tex. Penal Code Ann. §§51.04, 12.21. Strikingly, state judges must explicitly disregard any parallel federal immigration proceedings. Tex. Code Crim. Proc. Ann., Art. 5B.003 ("A court may not abate the prosecution of [the relevant S. B. 4 offense] on the basis that a federal determination regarding the immigration status of the defendant is pending or will be initiated").

C

The United States, two private organizations, and the County of El Paso challenged S. B. 4. In a thorough 114-page opinion, the District Court granted a preliminary injunction, which it then declined to stay pending appeal. The District Court concluded that "the Supremacy Clause and Supreme Court precedent affirm that states may not exercise immigration enforcement power except as authorized by the federal government," and it concluded that "SB 4 conflicts with key provisions of federal immigration law, to the detriment of the United States' foreign relations and treaty obligations." 2024 WL 861526, *1. Therefore, "to allow Texas to permanently supersede federal directives on the basis of an invasion would amount to nullification of

federal law and authority." *Ibid.*

Texas appealed to the Fifth Circuit and requested a stay pending appeal while the Fifth Circuit considered the District Court's preliminary injunction. The next day, in a one-sentence order, a divided panel of the Fifth Circuit granted a "temporary administrative stay," expedited the appeal, and deferred consideration of the motion for a stay pending appeal to the merits panel. App. to Application to Vacate Stay in No. 23A814, p. 2a. Oral argument is set for April 3, 2024.

## II

Procedure can be just as consequential as substance. The District Court concluded that S. B. 4 was likely unconstitutional and would cause immediate chaos were it to go into effect. Texas nonetheless asked for permission to enforce that law while appealing the preliminary injunction. Without any reasoned analysis, the Fifth Circuit granted that relief in a one-line administrative order. The Fifth Circuit abused its discretion, and this Court makes the same mistake by permitting a temporary administrative stay to alter the status quo that has existed for over a century.

When a court concludes that a law is (or likely is) unconstitutional, that decision generally takes immediate effect absent a stay. A stay "'suspend[s] judicial alteration of the status quo.'" *Nken* v. *Holder*, 556 U. S. 418, 429 (2009). Because it can take time to provide considered review of difficult questions, it is sometimes necessary to "grant preliminary relief to preserve the status quo ante—before the law went into effect." *Whole Woman's Health* v. *Jackson*, 594 U. S. ___, ___ (2021) (ROBERTS, C. J., dissenting). To enter a stay, a court must first decide that the underlying decision is likely wrong, will cause irreparable injury, and is contrary to the public interest. *Nken*, 556 U. S., at 429. Even this preliminary decision whether to grant a stay can take time, however.

That is where administrative stays come in. An administrative stay, or a "temporary stay," is even more preliminary. It is intended to pause the action on the ground for a short period of time until a court can consider a motion for a stay pending appeal. For that reason, at a minimum, administrative relief should (1) maintain the status quo and (2) be time limited. The Fifth Circuit's administrative stay here was neither, and thus constituted an abuse of discretion.

Here, the Fifth Circuit's administrative stay upends the status quo because it allows S. B. 4—a brand new state law that alters the delicate balance of federal and state power in immigration enforcement—to go into effect. The District Court preliminarily enjoined S. B. 4 and declined to stay that injunction. The Fifth Circuit did not need to enter an administrative stay to preserve the status quo; the District Court's decision already achieved that. The Fifth Circuit abused its discretion in entering the status-altering administrative stay.

The Fifth Circuit's administrative stay is also temporally unbounded. Because the Fifth Circuit deferred consideration of the motion for a stay pending appeal, the administrative stay is likely to last until the merits panel receives briefing, hears oral argument, and renders a decision on either Texas's appeal or at least Texas's motion for a stay pending appeal. That timeline would leave the administrative stay in effect for well over a month.*

This Court owes respect and deference to a lower court's

_____

*The Fifth Circuit recently has developed a troubling habit of leaving "administrative" stays in place for weeks if not months. See, *e.g.*, *United States* v. *Abbott*, No. 23–50632 (85 days, from Sept. 7, 2023, to Dec. 1, 2023); *Petteway* v. *Galveston Cty.*, No. 23–40582 (41 days, from Oct. 18, 2023, to Nov. 28, 2023); *Missouri* v. *Biden*, No. 23–30445 (66 days, from July 14, 2023, to Sept. 18, 2023); *R. J. Reynolds* v. *FDA*, No. 23–60037 (57 days, from Jan. 25, 2023, to Mar. 23, 2023); *Campaign Legal Ctr.* v. *Scott*, No. 22–50692 (48 days, from Aug. 12, 2022, to Sept. 29, 2022).

management of its own docket. Yet an administrative stay that not only upends the status quo but also extends that disruption indefinitely defeats the purpose of this Court's stay analysis and threatens to evade effective review of this unprecedented law. Cf. 16 C. Wright, A Miller, & E. Cooper, Federal Practice and Procedure §3922.1 (3d ed. 2023) (temporary restraining orders that extend for too long are "apt to be held appealable as a preliminary injunction"). In my view, even a single day of the status quo disruption likely to be caused by S. B. 4 based on an unreasoned order is one day too many. Whether the Fifth Circuit calls this an administrative stay or something else, it has all the hallmarks of a stay pending appeal. To grant a stay pending appeal, however, a court must apply the relevant factors.

Applying those factors, the District Court concluded that the applicants are likely to succeed on the merits of their claims because federal law pre-empts S. B. 4. Control of the Nation's borders, including the entry and exit of noncitizens, has long been the exclusive province of the Federal Government. See *supra*, at 2–3; see also *Chy Lung* v. *Freeman*, 92 U. S. 275, 280 (1876) ("The passage of laws which concern the admission of citizens and subjects of foreign nations to our shores belongs to Congress, and not to the States"). Because S. B. 4 appears to intrude on the exclusive federal authority to regulate entry and removal of noncitizens and does so in a way that conflicts with multiple provisions of federal law, the District Court concluded that S. B. 4 was likely unconstitutional. The District Court also found that S. B. 4 would cause irreparable harm if it went into effect. See *infra*, at 8–9. Texas identifies its harm as the failure of the Executive Branch to enforce immigration law, undoubtedly an issue on which there is ongoing political debate. Yet this Court has recently emphasized that "the Executive Branch also retains discretion over whether to remove a noncitizen from the United States," despite claims of harm to a State. *United States* v. *Texas*, 599 U. S.

670, 679 (2023).

In sum, the District Court concluded that S. B. 4 was both likely unconstitutional and would cause immediate turmoil, and denied Texas's request for permission to enforce the law nonetheless while appealing the preliminary injunction. Without any reasoned analysis, the Fifth Circuit granted that relief, and this Court now permits the Fifth Circuit's temporary administrative stay to linger indefinitely.

### III

The real world consequences of S. B. 4, many of which the District Court recognized, see 2024 WL 861526, *38–*43, illustrate why the Fifth Circuit and this Court should have proceeded carefully and deliberately to maintain the status quo before letting S. B. 4 go into effect.

First, S. B. 4 "immediately disrupt[s] sensitive foreign relations agreements, particularly around the destination for the removal of noncitizens," and "irreparably derail[s]" ongoing discussions with Mexico intended "to reduce irregular migration at the southern border." *Id.*, at *38. The United States has treaty obligations concerning where it may remove citizens of other Nations that S. B. 4 disregards by removing all targeted noncitizens to Mexico. "Mexico . . . has already protested the law and will likely continue to do so as Texas deports Central and South American immigrants into the country." *Id.*, at *43.

Second, S. B. 4 "frustrates the United States' efforts and obligations to protect individuals fleeing from persecution or torture." *Id.*, at *39. In particular, as the District Court noted, "state judges may not consider federal asylum applications as a reason to abate state removal proceedings." *Id.*, at *40. As a result, "Texas may remove or incarcerate many noncitizens with valid asylum or withholding claims, in violation of U. S. treaty obligations." *Id.*, at *43.

Third, S. B. 4 hampers active federal immigration enforcement efforts and places federal immigration officers in danger. The Department of Homeland Security (DHS) may "lose the ability to pursue expedited removals, which must be used to remove noncitizens within 14 days of their arrival into the country." *Id.*, at \*39. As the District Court noted, "[b]y changing immigration patterns to more dangerous terrain, SB 4 will also risk placing DHS officers in more danger as they mount emergency responses to individuals in life-threatening situations." *Ibid.* That same "[t]errain along these borders" may "resul[t] in more immigrant deaths." *Ibid.*

Fourth, S. B. 4 can harm "federal agencies' ability to detect security risks . . . as Texas police disrupt DHS's ability to centrally and timely monitor illicit drug trades, human trafficking, and imminent threats." *Id.*, at \*43. For example, "[e]ven if Texas does share all data related to noncitizen arrests with DHS, the agency will have a diminished ability to detect time-sensitive threats," which may hinder "counterterrorism efforts." *Id.*, at \*39.

Fifth, S. B. 4 may force El Paso County, one of the applicants, to "have to pay to expand its jail, provide counsel for indigent defendants, and hire more Sheriff deputies and court personnel. El Paso County may lose the ability to focus on high risk or violent criminals, harming its jail cost containment efforts." *Id.*, at \*40 (citation omitted).

Sixth, S. B. 4 "would immediately impose criminal liability on thousands of noncitizens who re-entered the state. The removal of noncitizens cannot be undone, even if a stay on [the District Court's] injunction is ultimately lifted. Thousands of individuals should not be arrested, incarcerated, or removed prior to resolution of SB 4's constitutionality." *Id.*, at \*43. Even if a state officer only "escorts a noncitizen to the border" and "departs after the noncitizen enters the other country," S. B. 4 still forces a noncitizen to "either depart into Mexico or . . . face 20 years in prison if

they do not." *Id.*, at \*17.

The District Court did not ignore Texas's own harm arguments, of course. "[T]he Court does not doubt the risk that cartels and drug trafficking pose to many people in Texas. But as explained, Texas can (and does) already criminalize those activities." *Id.*, at \*42.

In light of the consequences detailed by the District Court, the Fifth Circuit should have considered the constitutionality and irreparable harm caused by S. B. 4 before allowing the law to go into effect. Instead, it opened the door to profound disruption. This Court makes the same mistake.

\* \* \*

The Court confronts a state immigration law that will transform the balance of power at the border and have life-altering consequences for noncitizens in Texas. Texas's novel scheme requires careful and reasoned consideration in the courts. The District Court gave S. B. 4 careful consideration and found that it was likely unconstitutional. The Fifth Circuit has not yet weighed in, but nevertheless issued a one-sentence administrative order that is maximally disruptive to foreign relations, national security, the federal-state balance of power, and the lives of noncitizens. The Court should not permit this state of affairs. I dissent.

# SUPREME COURT OF THE UNITED STATES

———————

No. 23A814

———————

UNITED STATES *v.* TEXAS, ET AL.

ON APPLICATION TO VACATE STAY

———————

No. 23A815

———————

LAS AMERICAS IMMIGRANT ADVOCACY CENTER,
ET AL. *v.* STEVEN McCRAW, DIRECTOR, TEXAS
DEPARTMENT OF PUBLIC SAFETY, ET AL.

ON APPLICATION TO VACATE STAY

[March 19, 2024]

JUSTICE KAGAN, dissenting from denial of applications to
vacate stay.

I respectfully dissent from the Court's denial of this ap-
plication to vacate the stay. In my judgment, the applicants
satisfy the four-factor test set out in *Nken* v. *Holder*, 556
U. S. 418, 434 (2009), governing when a stay pending ap-
peal is appropriate. My views of the merits are, as always
in this posture, preliminary. But the subject of immigration
generally, and the entry and removal of noncitizens partic-
ularly, are matters long thought the special province of the
Federal Government. See *Arizona* v. *United States*, 567
U. S. 387, 394 (2012); *Chy Lung* v. *Freeman*, 92 U. S. 275,
280 (1876). Given that established understanding, I would
not allow Texas Senate Bill 4 to go into effect. And in the
circumstances, I do not think the Fifth Circuit's use of an
administrative stay, rather than a stay pending appeal,
should matter. Administrative stays surely have their
uses. But a court's unreasoned decision to impose one for

more than a month, rather than answer the stay pending appeal issue before it, should not spell the difference between respecting and revoking long-settled immigration law.